**RECORD NOS. 15-1446(L); 15-1447**

*In The*

# United States Court Of Appeals
## For The Fourth Circuit

### JUSTIN D. THOMAS; IRENE S. THOMAS,
*Plaintiffs - Appellants,*

**v.**

### CARMEUSE LIME & STONE, INCORPORATED;
### O-N MINERALS (CHEMSTONE) COMPANY,
*Defendants - Appellees/Cross-Appellants,*

**v.**

### THOMAS M. HELMS, SR.,
*Intervenor/Defendant - Appellee.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE**

---

**OPENING AND RESPONSE BRIEF OF
APPELLEES/CROSS-APPELLANTS**

---

Thomas Moore Lawson
Joshua E. Hummer
LAWSON AND SILEK, P.L.C
P.O. Box 2740
Winchester, VA 22604
(540) 665-0050

Robert C. Hagan, Jr.
ATTORNEY AT LAW
P.O. Box 448
26 E. Main Street
Fincastle, VA 24090
(540) 473-2044

*Counsel for Appellees/Cross-Appellants
Carmeuse Lime & Stone, Inc.
and O-N Minerals (Chemstone) Company*

*Counsel for Intervenor/Appellee
Thomas M. Helms, Sr.*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-1446(L);15-1447    Caption: Justin D. Thomas & Irene S. Thomas v. Carmeuse Lime & Stone, Inc., et al., and Thomas Helms, Sr.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Carmeuse Lime & Stone, Inc. and O-N Minerals (Chemstone) Company
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:  O-N Minerals Company
                     Oglebay Norton Company, LLC
                     Carmeuse Lime & Stone, Inc.
                     Carmeuse Lime, Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ☑NO If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: ____May 11, 2015____

Counsel for: Carmeuse Lime & Stone, Inc. and O-N Minerals (Chemstone) Company

### CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on ____May 11, 2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

J. Scott Sexton, Esquire
GENTRY LOCKE
10 Franklin Road, S.E.
P.O. Box 40013
Roanoke, VA  24022-0013

Robert C. Hagan, Jr., Esquire
P.O. Box 448
26 E. Main Street
Fincastle, VA  24090

_____
(signature)

____May 11, 2015____
(date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-1446(L    Caption: Justin Thomas v. Carmeuse Lime & Stone, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Thomas M. Helms, Sr.
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _04 - 27 - 2015_

Counsel for: _Thomas M. Haluse, Sr_

## CERTIFICATE OF SERVICE
***************************

I certify that on _____April 27, 2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Thomas Moore Lawson                          Jeffery Scott Sexton
tlawson@lsplc.com                            scott_sexton@gentrylocke.com
adow@lsplc.com
jkittlaus@lsplc.com
jhummer@lsplc.com

_____                    _04 - 27 - 2015_
(signature)                                  (date)

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ............................................................................. viii

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES – APPEAL NO. 15-1446(L) ...............................1

STATEMENT OF THE ISSUES – CROSS-APPEAL NO. 15-1447 ......................2

STATEMENT OF THE CASE..............................................................................2

    I.     Factual Background...........................................................................2

    II.    Chain of Title for the Mineral Estate ...............................................5

        A.    The 1849 Deed created a Mineral Estate on the Property. .........5

            1.    The Mineral Estate included "all of the stone and rock of every kind." ........................................................5

            2.    The Mineral Estate also included the rights to quarry and remove stone and to construct and operate kilns on the Property. ...........................................6

            3.    The Mineral Estate was also subject to several restrictions, including a restriction on quarrying stone within an undefined Yard......................................7

            4.    The location of the undefined Yard is unknown. .............8

        B.    The entire Mineral Estate was conveyed by the 1901 and 1902 Deeds.......................................................................9

            1.    The Mineral Estate was divided into two separate Parcels by the Botetourt County Chancery Court. ...........9

            2.    The Parcels were split by a division line across the Property, located 300 feet northeast of the southwestern Property line. ...........................................10

i

3.    In 1901, both Parcels (including the entire Mineral Estate) were sold to several of Wilsons' heirs...............12

C.    The 1992 Deeds conveyed Parcel No. 1 to Helms and Parcel No. 2 to Carmeuse..........................................13

1.    Parcel No. 2 was subsequently leased to Carmeuse's predecessor in interest beginning in 1917 and continuing through 1992................................13

2.    In 1992, Parcel No. 2 was sold to the same company that had been leasing it (Carmeuse's predecessor in interest). ...................................15

3.    Later in 1992, Parcel No. 1 was sold to Thomas M. Helms, Sr. ........................................................16

III.    Procedural Background ........................................................16

SUMMARY OF ARGUMENT .................................................................17

ARGUMENT ...............................................................................................20

I.    Standard of Review and Applicable Law..........................................20

A.    Legal Standard of Review..........................................................20

B.    Legal Principles for Deed Interpretation ..............................21

1.    The primary goal in interpreting a deed is to realize the parties' intention. ...........................................21

2.    A court must first determine whether or not a deed is ambiguous. ...................................................21

3.    Ambiguous deeds may be interpreted using surrounding circumstances. ...........................................22

4.    Ambiguous deeds must be interpreted in favor of the grantee and against the grantor.................................22

5.  Ambiguous deeds may be resolved by the chain of title. ...............................................................22

6.  Ambiguous deeds must be considered as a whole and harmonized. ..............................................23

7.  Ambiguous deeds must be interpreted to fit the land. ...................................................................23

II.  The District Court correctly ruled that the Yard Restriction is not enforceable. ..................................................................23

A.  The Yard Restriction is not enforceable under the rule of repugnancy. ....................................................................24

1.  The Yard Restriction conflicts with the granting clause in the 1849 Deed. ................................25

2.  The Yard Restriction cannot be determined with "reasonable certainty." ....................................27

i.  The location of the Yard is not reasonably certain. .................................................................27

ii.  The rights conveyed by the Yard Restriction are not reasonably certain. ....................................28

B.  The Yard Restriction is not enforceable because its purpose (protecting occupants) is now impossible. .................30

1.  The Yard Restriction's purpose was to protect the occupants of Reynolds' house from annoyance. ............30

2.  The only structure currently on the Property cannot be occupied under the zoning laws of Botetourt County. ...............................................................32

3.  The parties to the 1849 Deed did not intend the Yard Restriction to be enforceable when Reynolds home was not occupied. ..................................34

C.    The Yard Restriction is not enforceable under the general rules of deed construction. ........................................................36

D.    The Yard Restriction is not enforceable under the doctrine of changed circumstances. ..........................................37

III.    The District Court correctly ruled that the 1901 and 1902 Deeds conveyed the entire Mineral Estate. ....................................................38

A.    The plain language of the 1901 and 1902 Deeds confirms that they conveyed the entire Mineral Estate. ............................38

1.    The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by using the term "limestone." ...........................39

2.    The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by using the phrase "along the vein of grey limestone." ...................................................................41

3.    The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by referring to "Dillon's heirs." ...........................43

B.    The references to the Chancery Suit in the 1901 and 1902 Deeds confirm that they conveyed the entire Mineral Estate. .......................................................................44

1.    The Chancery Court defined Parcel No. 1 and Parcel No. 2 as containing the entire Mineral Estate. ...............................................................45

2.    The 1901 and 1902 Deeds both state that they are conveying Parcel No. 2 and Parcel No. 1 respectively. ..................................................................45

3.    The Chancery Court ordered that Parcel No. 2 be conveyed in the 1901 Deed and Parcel No. 1 be conveyed in the 1902 Deed. ............................................46

iv

4.      The parties to the 1901 and 1902 Deeds and the Chancery Suit intended to convey the entire Mineral Estate.................................................47

C.      The principles of deed construction confirm that the 1901 and 1902 Deeds conveyed the entire Mineral Estate.................47

IV.      The District Court correctly held that Carmeuse and Helms have the right to disturb the surface of the Property and quarry the Stone using modern technology. ....................................................47

A.      The method of quarrying limestone has not changed fundamentally since the 1849 Deed.........................................48

B.      The 1849 Deed confirms that Carmeuse and Helms have the right to disturb the surface of the Property. .......................50

C.      Virginia law confirms that Carmeuse and Helms have the right to disturb the surface of the Property. ..............................51

D.      Virginia law confirms that Carmeuse and Helms have the right to use modern quarrying techniques.................................52

V.      The Court incorrectly and inconsistently ruled that the 1992 Deeds conveyed one half of the mineral estate to Helms and one half to Carmeuse.........................................................................55

A.      The "Half the Veins" Paragraph from the 1992 James River Deed is ambiguous. .......................................................58

1.      The "Half-the-Veins" Paragraph can be understood in more than one way......................................................59

2.      The "Half the Veins" Paragraph cannot be fit to the land.........................................................................59

i.      The location of the Veins cannot be determined without digging them up. .................60

ii.    The "Half-the Veins" Paragraph provides no
starting or ending location for its
measurement..........................................................60

3.    The "Half-the-Veins" Paragraph was unable to be
applied by an expert surveyor........................................62

4.    The "Half-the-Veins" Paragraph was unable to be
applied by an expert geologist. .....................................62

5.    The District Court did not resolve the ambiguity of
the "Half-the-Veins" Paragraph by suggesting a
"geological survey" would be "necessary." .................63

B.    The surrounding circumstances establish Carmeuse owns
the entire Mineral Estate, except the 300 Foot Strip. ..............63

1.    The chain of title establishes that Carmeuse owns
the entire Mineral Estate, except the 300 Foot
Strip....................................................................64

i.    The 300 Foot Line has been maintained
throughout the chain of title since it was
created in 1900. ....................................................64

ii.    The leases in the chain of title confirm that
the "Half-the-Veins" Paragraph refers to
entire Mineral Estate except for the 300 Foot
Strip. ...................................................................65

2.    Helms' own testimony confirms that Carmeuse
owns the entire Mineral Estate except the 300 Foot
Strip....................................................................67

C.    The rules of deed interpretation confirm that Carmeuse
owns the entire Mineral Estate, except for the 300 Foot
Strip...........................................................................67

1.    The ambiguous "Half-the-Veins" Paragraph must
be interpreted in favor of Carmeuse. ...........................67

2.    The ambiguous "Half-the-Veins" Paragraph must be harmonized with all parts of the 1992 Deeds, including the references to the 300 Foot Line. ...............68

3.    The ambiguous "Half-the-Veins" Paragraph must be fit to the land which only can be done with the 300 Foot Line. ...............................................68

CONCLUSION .................................................................................69

STATEMENT REGARDING ORAL ARGUMENT ...........................................70

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

Am. Safety Cas. Ins. Co. v. C.G. Mitchell Const., Inc.,
268 Va. 340, 601 S.E.2d 633 (2004) ............................................................52

American Canoe Association, Inc. v. Murphy Farms, Inc.,
326 F.3d 505 (4th Cir. 2003) ......................................................................32

Atwood v. Rodman,
355 S.W.2d 206 (Tex. Civ. App 1962).........................................................51

Auerbach v. County of Hanover,
252 Va. 410 (1996) ....................................................................................21

Benn v. Hatcher,
81 Va. 25 (1885) ........................................................................................28

Berry v. Klinger,
225 Va. 201 (1983) ....................................................................................21

Beury v. Shelton,
151 Va. 28 (1928) ................................................................... 49, 50, 51, 54

Bradley v. Virginia Ry. & Power Co.,
87 S.E. 721 (Va. 1916) ........................................................................ 29, 34

Butcher v. Creel's Heirs,
50 Va. 201 (1852) ................................................................................ 24, 26

Camp v. Camp,
220 Va. 595 (1979) ....................................................................................21

Campbell v. Tennessee Coal, Iron & R. Co.,
265 S.W. 674 (Tenn. 1924) ...................................................................51-52

Chesapeake Corporation of Virginia v. McCreery,
216 Va. 33 (1975)......................................................................................26

Chesterfield Meadows Shopping Center Associates, L.P. v. Smith,
    264 Va. 350 (2002) .......................................................................... 18, 36, 53

CNX Gas Co. LLC v. Rasnake,
    752 S.E.2d 865 (Va. 2014) ................................................... *passim*

Davis v. Seybold,
    195 F. 402 (4th Cir. 1912) ........................................................ 24, 64

Goodson v. Capehart,
    232 Va. 232 (1986) ......................................................................... 24

Heinatz v. Allen,
    147 Tex. 512, 217 S.W.2d 994 (1949) ........................................... 51

James River Hydrate & Supply Co. v. United States,
    337 F.2d 277 (4th Cir. 1964) ......................................................... 40

Kilpatrick v. Twin States Realty Co., Inc.,
    193 Miss. 599, 10 So. 2d 447 (1942) ............................................ 35

Kinder v. La Salle Cnty. Carbon Coal Co.,
    310 Ill. 126, 141 N.E. 537 (1923)................................................. 51

Little v. Carter,
    408 S.W.2d 207 (Ky. 1966).......................................................... 51

McKinnon v. Neugent,
    225 Ga. 215 (1969) ....................................................................... 35

Moore Brothers Company v. Brown & Root, Inc.,
    207 F.3d 717 (4th Cir. 2000) ........................................................ 33

North Carolina Farm Bureau Mutual Insurance Company v.
Clear Technology, Inc.,
    601 Fed. App'x 181 (4th Cir. Feb. 4, 2015)................................... 20

Oakwood Smokeless Coal Corp. v. Meadows,
    184 Va. 168 (1945) ................................................................. 52, 53

Phipps v. Leftwich,
    216 Va. 706–10, 222 S.E.2d 536 (1976) ................................................. 53, 54

Pilkerton v. Roberson,
    65 S.E. 835 (Va. 1909) ...................................................................67

Poindexter v. Molton,
    237 Va. 448 (1989) .........................................................................21

Quality Properties Asset Management Company v.
Trump Virginia Acquisitions, LLC,
    2012 WL 3542527 (W.D. Va. Aug. 16, 2012) ............................................37

Reeves v. Comfort,
    172 Ga. 331 (1931) .........................................................................35

Rudd v. Hayden,
    265 Ky. 495, 97 S.W.2d 35 (1936).................................................... 51, 52

Save Our Little Vermillion Env't, Inc. v. Illinois Cement Co.,
    311 Ill. App. 3d 747, 725 N.E.2d 386 (2000)...............................................51

Scott v. Walker,
    274 Va. 209 (2007) .........................................................................28

Sharp v. Shenandoah Furnace Co.,
    100 Va. 27, 40 S.E. 103 (1901) ...................................................................58

Smith v. Bailey,
    141 Va. 757 (1925) ......................................................... 23, 58, 68

State v. Reece,
    374 S.W.2d 686 (Tex. Civ. App. 1964)......................................................35

Travis v. Bulifant,
    226 Va. 1 (1983) ...........................................................................67

United States v. Bolander,
    722 F.3d 199 (4th Cir. 2013) .........................................................20

Video Zone, Inc. v. KF&F Properties, L.C.,
    267 Va. 621 (2004) ..................................................................28

W. D. Nelson & Co. v. Taylor Heights Dev. Corp.,
    207 Va. 386 (1966) ..................................................................36

Wagoner v. Jack's Creek Coal Corp.,
    199 Va. 741, 101 S.E.2d 627 (1958) .........................................53

White v. Miller,
    200 N.Y. 29 (1910) ..................................................................51

Williams v. Gibson,
    84 Ala. 228 (1888) ...................................................................53

Wolverton v. Hoffman,
    52 S.E. 176 (Va. 1905) .............................................................24

Wornom v. Hampton Normal & Agric. Inst.,
    144 Va. 533 (1926) ..................................................................24

Yukon Pocahontas Coal Co. v. Ratliff,
    181 Va. 195, 24 S.E.2d 559 (1943) ............................... 28, 53, 54

**Rules**

Fed. R. App. P. 4(a)(1)(A) .............................................................1

Fed. R. App. P. 4(a)(4) ..................................................................1

**Other Authorities**

20 Am.Jur. 2d, Covenants § 165......................................................35

## JURISDICTIONAL STATEMENT

Carmeuse and Helms adopt and incorporate Appellants' Jurisdictional Statement.  Furthermore, Carmeuse timely filed its Notice of Appeal for its cross-appeal within thirty days from the District Court's entry of an Order disposing of Helms' Motion to Amend Order (Joint Appendix[1] ("JA") 1777) pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) and 4(a)(4).  Carmeuse's Notice of Appeal (JA 1798) was filed on April 20, 2015, within thirty days of the entry of the Order Denying Motion to Amend on April 7, 2015 (JA 1796).

## STATEMENT OF THE ISSUES – APPEAL NO. 15-1446(L)

1.    Did the District Court correctly hold that an ambiguous reservation of rights by the grantor in the 1849 Deed (defined below as the "Yard Restriction") was void when its express purpose was impossible to fulfill and it conflicted with the broad granting clause of the deed?

2.    Did the District Court correctly hold that the 1901 and 1902 Deeds conveyed the entire Mineral Estate on the Property when both deeds clearly stated that they were conveying "all" the Mineral Estate, referenced the 1849 Deed which created the Mineral Estate, and referenced a chancery proceeding in which the parties were ordered to convey the entire Mineral Estate?

---

[1] Many of the documents in the Joint Appendix prepared by Appellants are much harder to read than those in the original record.  Appellees are happy to provide better copies upon request of this Court.

1

3.     Did the District Court correctly hold that the owners of the Mineral Estate are not limited to quarrying techniques used in 1849 and may quarry limestone using modern quarrying techniques including open pit quarries which have been used since before the creation of the Mineral Estate?

## STATEMENT OF THE ISSUES – CROSS-APPEAL NO. 15-1447[2]

4.     Did the District Court erroneously rule that Carmeuse owned less than half the Mineral Estate when its own rulings were inconsistent and the chain of title clearly stated that Carmeuse owned all of the Mineral Estate except for a small portion on a 300 foot strip?

## STATEMENT OF THE CASE

## I.    <u>Factual Background</u>

Appellants Justin D. and Irene S. Thomas ("Appellants") are the owners of the surface rights of a parcel of real property in Botetourt County, Virginia, near the town of Buchanan ("Property"). (JA 407). These surface rights are expressly subject to the mineral estate ("Mineral Estate") owned by Appellees O-N Minerals (Chemstone) Company[3] ("Carmeuse") and Thomas M. Helms, Sr. ("Helms"). (JA 406-17).

---

[2] Appellee Thomas M. Helms, Sr. does not join in the portions of this Brief that relate to this fourth issue.

[3] Appellants also named Appellee Carmeuse Lime & Stone Inc. as a defendant in this matter. (JA 155). Both Carmeuse Lime & Stone Inc. and O-N Minerals (Chemstone) Company are referred to herein as Carmeuse.

Appellants purchased the Property in 2002 with full knowledge that Carmeuse's predecessor in interest (henceforth collectively referred to as "Carmeuse") owned at least a portion of the stone and quarrying rights on the Property and was operating a large limestone quarry on the adjacent property. (JA 565-566).

Since purchasing the Property in 2002, Appellants have attempted to use their interest in title for their economic interests. Appellants have repeatedly demanded that Carmeuse pay them for the right to access the Mineral Estate and have taken various actions to prohibit Carmeuse and Helms from quarrying on the Property. (JA 646-696).

Appellants first attempted to rezone the Property so that quarrying or mining would be prohibited. (JA 912-919). When that failed, Appellants tried to convince Helms to surrender his ownership in the Mineral Estate. Helms refused. (JA 1533-35).

Appellants then decided to file a quiet title action to obtain ownership of the Mineral Estate. Even though Appellants clearly knew of Carmeuse and Helms' ownership of the Mineral Estate, they did not name either as a party in their suit. (JA 1152-1154). Carmeuse was fortunate to learn of the suit as a result of a surveyor reading the notice publication in a local newspaper. Carmeuse and Helms intervened in the case and Thomas subsequently non-suited it. (JA 900-901).

Soon after the non-suit, Appellants began demanding (through their sister and sister-in-law, Denise Knudsen) that Carmeuse purchase their ownership interest in the Property. (JA 646-696). The purchase price varied from five (5) to ten (10) times what Appellants had paid, and Appellants continually informed Carmeuse that it was not allowed to enter the Property unless Carmeuse paid them. Id. Carmeuse continually refused Appellants' demands to pay for what Carmeuse already owned. Id.

Finally, Appellants filed the underlying declaratory judgment action. (JA 155). In this action, Appellants have included various, sundry and sometimes conflicting claims and have portrayed themselves a "landowners of modest means" who are simply interested in enjoying the environmental and historic nature of the Property. (JA 44-47).

In truth, Appellants are property speculators whose sole purpose since they purchased the Property has been to obtain payment from Carmeuse. Carmeuse and Helms agree with the District Court that the reasons for Appellants' actions are irrelevant to the interpretation of the deeds at issue, but have included this brief section to correct the many misconceptions and misstatements in Appellants' Opening Brief, ECF No. 25 ("Opening Brief").

**II.    Chain of Title for the Mineral Estate**

In short, Appellants are arguing that Helms and Carmeuse do not own or do not have the right to use the Mineral Estate.  In spite of the many irrelevant facts and misstatements in Appellants' statement of the case, this property dispute is based on the chain of title to the Mineral Estate, and specifically on three sections of the chain of title: (a) the 1849 Deed (JA 419), (b) the 1901 and 1902 Deeds (JA 441, 444), and (c) the 1992 Deeds (JA 477, 481).

Appellants concede that the remainder of the chain of title does not provide any basis for their claims.  These three sections of deeds are addressed below, along with other portions of the chain that are referenced by these deeds.

**A.    The 1849 Deed created a Mineral Estate on the Property.**

*1.    The Mineral Estate included "all the stone and rock of every kind."*

In 1849, Greenville and Frances Reynolds ("Reynolds") agreed to convey to John S. Wilson ("Wilson") 127 acres of land and "all the stone and rock of every kind, and particularly all limestone or quarries of limestone or other kind of stone" (the "Stone") on all of Reynolds' remaining property.  Reynolds conveyed all of this property in a deed dated August 15, 1851 and recorded on September 1, 1851

5

in the Office of the Clerk of the Circuit Court of Botetourt County, Virginia, in Deed Book 31, Page 271 (the "1849 Deed[4]").  (JA 406, 419-425).

The Property is a portion of Reynolds' remaining land on which Wilson was granted "all the stone and rock of every kind."   The Property is identified as Botetourt County Tax Map (M)43-22.  After conveying the Stone on the Property to Wilson, the Property was conveyed to various other owners as part of a larger 200 acre parcel variously known as the "Pitzer Tract," the "Webster Tract" and the "Alphin Tract" in the chain of title.  (JA 407).

2.    *The Mineral Estate also included the rights to quarry and remove stone and to construct and operate kilns on the Property.*

The 1849 Deed also granted to Wilson a number of rights related to quarrying, including, specifically, the rights of "free ingress, egress, and regress, at all times, to enter and quarry, and take the same away or to construct kilns and burn the same into lime…" (the "Quarrying Rights").   (JA 408, 421, 424). Together, the Stone and the Quarrying Rights are referred to herein as the "Mineral Estate."

---

[4] Although the Deed was dated and recorded in 1851, the District Court and Appellants referred to it as the 1849 Deed, as did Carmeuse prior to its own title search.  Accordingly, for convenience, Carmeuse will refer to it as the 1849 Deed herein.

3.    *The Mineral Estate was also subject to several restrictions, including a restriction on quarrying stone within an undefined Yard.*

The 1849 Deed contains three "limitations or qualifications" on Wilson's access to the Stone and Quarrying Rights. (JA 408). First, Reynolds is permitted to burn lime from the Stone (5,000 bushels per year) and Reynolds and his heirs are permitted to use the Stone for building purposes. (JA 408, 421, 424). Next, Reynolds and his heirs or assigns are entitled to receive "a fair and reasonable compensation" if the quarrying damages their crops. (JA 408-409, 421, 424). Finally, Reynolds is entitled to the following protection:

> And it is also agreed and understood between the parties, that the said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the inclosure of the yard attached to the said Reynolds' present dwelling house; this provision being inserted to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the occupancy of the house from annoyance.

(JA 409, 421, 424).

This provision is hereinafter referred to as the "Yard Restriction," and the yard attached to the Reynolds' dwelling house is hereinafter referred to as the "Yard."

The Yard Restriction only prohibited blasting, quarrying, or taking away stone. Pursuant to the granting clause, Wilson could enter or leave the Property through the Yard, and could construct and use kilns in the Yard. (JA 408, 421, 424).

7

4.    *The location of the undefined Yard is unknown.*

Appellants' own expert historian, Dr. Daniel Barrett Thorp, admitted that the yard cannot be bound, stating:

> **Nor is it possible without a full archaeological survey of the property to say exactly what structures stood where…. Nor can we know exactly what Reynolds meant by "the enclosure of the yard attached to…the dwelling house."**

(JA 587-588)(emphasis added).

Both of Carmeuse's experts, Dr. Kenneth E. Koons and Mr. Charles Reid McMurry, Jr. agreed. (JA 409-410, 554-555). Dr. Koons, a professor of history at the Virginia Military Institute, found that "it is likely that another structure [besides the current stone structure on the Property] is the dwelling house referred to in the [1849] Deed." (JA 555). He also noted that "the boundaries of the Yard have not survived in either the historical record or the physical location." (JA 554).

Mr. McMurry, a surveyor, stated that "[i]t is likely not possible to determine the location of" the Yard. Mr. McMurry further stated that the "stone structure on the Property is likely not [Reynolds'] dwelling house." (JA 409). Thus, the location of the Yard is unknown and unknowable.

**B.    The entire Mineral Estate was conveyed by the 1901 and 1902 Deeds.**

  *1.    <u>The Mineral Estate was divided into two separate Parcels by the Botetourt County Chancery Court</u>.*

Wilson, the grantee in the 1849 Deed, died in 1877 and his five children continued to operate his business which mostly consisted of leasing his limestone properties.  (JA 410).  In 1892, several granddaughters of Wilson filed suit against the rest of the family demanding that Wilson's estate be sold and distributed ("Chancery Suit"). The Botetourt County Chancery Court ("Chancery Court") appointed Special Commissioners and ordered the limestone property owned by Wilson (including the Mineral Estate) sold as two separate quarries, identified as Parcel No. 1 and Parcel No. 2.  (JA 410-11).

These two quarries/parcels are described on the Additional Special Terms of Sale the Special Commissioners issued for the public auction as follows:

> Parcel No. 1: A tract near Indian Rock of about 200 acres…This parcel **includes also the stone rights on the D.L. Pitzer tract** for a distance of three hundred feet from the division line between E. Dillon's heirs and the Pitzer tract, along the vein of grey Limestone in a north-easterly direction instead of eight hundred feet, as the line was at the former offering…
>
> Parcel No. 2: A tract of about 300 acres, more or less adjacent to Rocky Point… and **all the stone and mineral rights on the Pitzer land** North-East of the line of division between this tract and no. 1 set out above under description of tract no. 1…
>
> (JA 410-411, 429)(emphasis added).

The Pitzer land referred to in the Special Terms of Sale includes the Property. Both Parcel No. 1 and Parcel No. 2 contained approximately an equal amount of high-calcium limestone, which could be burned or reduced to high quality lime.[5] See (JA 497).

2.    *The Parcels were split by a division line across the Property, located 300 feet northeast of the southwestern Property line.*

The Mineral Estate was divided between Parcel No. 1 and Parcel No. 2 by a "division line" across the Property. Initially, the "division line" was located 800 feet north-east of the southern property line of the Property (then known as the "Pitzer Tract"). The Mineral Estate south of that line was part of the southern quarry, Parcel No. 1, and the Mineral Estate north of that line was part of northern quarry, Parcel No. 2. (JA 411, 429).

On October 26, 1900, the Chancery Court changed the location of the division line between the two parcels and ordered as follows:

> And with regard to the limestone property…it is ordered that the division line between the two parcels in which said property will be offered is to run three hundred (300) feet from the division line between E. Dillon heirs and the Pitzer Tract, along the vein of grey limestone in a North Easterly direction, instead of (800) feet as the line was at the former offering.

(JA 412, 430-431, 433).

---

[5] Helms does not join in this sentence of the Statement of the Case.

The land referred to as "E. Dillon's heirs" is currently identified as Botetourt County Tax Map 53-101, and may have also included Botetourt County Tax Map 42(2)3.[6]  (JA 412, 1503-04).  The final descriptions of Parcels Nos. 1 and 2 are based on this new three hundred (300) foot division line ("300 Foot Line").  (JA 412).  The roughly rectangular area defined by the "line three hundred feet from the line of the E. Dillon land" that is included in Parcel No. 1 as shown on the map below is referred to herein as the "300 Foot Strip."  (JA 412, 434).



---

[6] Mr. McMurry found that Dillon did own Botetourt County Tax Map 42(2)(3), but he did not research to confirm that Dillon owned it in 1901 because "the reference to the E Dillon land is merely a location and orientation reference, not a limitation on the property conveyed in the 1901 Deed." (JA 1503-04).

3.    *In 1901, both Parcels (including the entire Mineral Estate) were sold to several of Wilsons' heirs.*

Both Parcels were advertised for a public auction on May 10, 1901. A newspaper advertisement stated that the property being sold included "about 486 acres of land, with the right to quarry stone on 200 acres additional on what is known as the Pitzer tract." (JA 412, 435-437). After the public auction on May 10, 1901, the Court accepted an offer of $15,510.00 from one of Wilson's daughters, Louise W. Turpin, for both Parcels Nos. 1 and 2. (JA 413, 438).

By Order dated November 1, 1901, the Chancery Court ordered Special Commissioner Frank T. Glasgow to transfer title to Parcel No. 2 to Ms. Turpin once the purchase price was paid. (JA 413, 439). By Deed dated December 23, 1901 ("1901 Deed"), Mr. Glasgow transferred to Ms. Turpin and various other Wilson heirs title to Parcel No. 2, including the following:

> [T]he right to all the limestone **on the land of the late G.B.W. Reynolds, now in the name of Lavinia Pitzer**…along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from the line of the E. Dillon land, together will [*sic*] all the rights of ingress, egress, and regress, and all the privileges and rights of quarrying, and using, and burning, and removing the stone on this Pitzer, or Reynolds, land, accorded said John S. Wilson in the deed recorded in Deed Book no. 31 page no. 271….**All of which properties and rights, are described in the papers of the said causes, as "Parcel no. 2."**

(JA 413, 441-442)(emphasis added).

12

On May 27, 1902, the Chancery Court ordered Mr. Glasgow to transfer Parcel No. 1 to Ms. Turpin. (JA 414, 443). By Deed dated July 26, 1902 ("1902 Deed"), Mr. Glasgow conveyed title to Parcel No. 1 to Ms. Turpin and various other heirs of Wilson, including, specifically, the following:

> [A]ll that property sold to said Louise W. Turpin…**described therein, as "Parcel no. 1,"** of the Limestone properties of John S. Wilson decd.,…**This deed also conveys all the stone on the land of Lavinia Pitzer, from line of "parcel no. 2," (which parcel has heretofore been conveyed by said commissioner to the parties of the second part, by deed of date the 23d day of December 1901) thence South West to E. Dillon's line;** together with all rights of ingress, egress and regress to said lands, and all other rights and appurtenances, as to quarrying, and burning said stone, and all other rights as to said stone, and said land, now owned by the heirs of said Lavenia Pitzer, which rights &c, were conveyed to said John S. Wilson by G.B.W. Reynolds in deed recorded in said Clerk's Office, in Deed Book no. 31, page 271.

(JA 414, 444-45)(emphasis added).

### C. The 1992 Deeds conveyed Parcel No. 1 to Helms and Parcel No. 2 to Carmeuse.[7]

#### 1. *Parcel No. 2 was subsequently leased to Carmeuse's predecessor in interest beginning in 1917 and continuing through 1992.*

On September 6, 1917, the Wilsons agreed to lease Parcel No. 2 to John Stull (the "1917 Lease"). The property leased is described as the fee simple portion of Parcel No. 2 (the "306-acre tract") and also the following:

---

[7] Helms does not join in the portions of the Statement of the Case regarding the 1992 Deeds.

> [T]he stone rights, with all the rights and privileges necessary to quarry and remove the stone, on half the veins of limestone on a 200 acres tract of land belonging to G. W. Webster, and adjoining the 306 acre tract; said half to be measured along the veins of limestone from the division line of said 306 acre tract; in a southwesterly direction… the 306 acre tract and the stone rights on the 200 acres adjoining, mentioned in this lease above, is the tract no. 1 conveyed to the parties of the first part by F. T. Glasgow, Commissioner, of date the ___ day of ____, 1____, and recorded in the Clerk's Office of Botetourt county in D.B. ____, page ____.

(JA 414-15, 446).

This description (the "Half-the-Veins" Paragraph) contains several blanks and one clear error (the reference to "tract [Parcel] no. 1" instead of Parcel No. 2[8]) (JA 415), an indication that the Wilson heirs did not give careful thought to the language of this "Half-the-Veins" Paragraph. (JA 415).

In 1925, the Wilson heirs formed the Wilson Lime Company, Incorporated ("Wilson Lime Company") and transferred both Parcel No. 1 and Parcel No. 2 to it. The Wilson Lime Company then leased Parcel No. 2 (conveyed by the 1901 Deed) to Liberty Lime & Stone Company, Incorporated in a Lease dated January 12, 1925 ("1925 Lease"). (JA 415, 456). The 1925 Lease was assigned by Liberty Lime & Stone Company, Incorporated to Liberty Limestone Corporation on November 13, 1930 ("1930 Assignment"). (JA 416, 462).

---

[8] Subsequent leases confirmed that the 1917 Lease intended to lease Parcel No. 2, conveyed by the 1901 Deed. (JA 415).

The Lease of Parcel No. 2 was renewed with Liberty Limestone Corporation on July 10, 1953 ("1953 Lease"), which was a restatement of the 1917 and 1925 Leases.  (JA 416, 465).

2. *In 1992, Parcel No. 2 was sold to the same company that had been leasing it (Carmeuse's predecessor in interest).*

In a deed dated July 22, 1992, the Wilson Lime Company conveyed Parcel No. 2 to James River Limestone Company, Incorporated ("1992 James River Deed").  (JA 477).  James River Limestone Company, Incorporated is the successor in interest to the Liberty Limestone Corporation involved in the leases of Parcel No. 2 and is the predecessor in interest to Defendant O-N Minerals (Chemstone) Company.  (JA 738-739).  The 1992 James River Deed stated in its derivative clause that the property being transferred was the same property transferred in the 1901 Deed (Parcel No. 2).  (JA 478).  Following this derivative clause, the 1992 James River Deed includes language similar to the "Half-the-Veins" Paragraph in the above leases. (JA 478-479).

While the "Half-the-Veins" Paragraph is ambiguous, the remainder of the 1992 James River Deed along with the chain of title confirm that the portion of the Mineral Estate being transferred was the same portion of the Mineral Estate in Parcel No. 2, which included all of the Mineral Estate on the Property except for the 300 Foot Strip described above.  (JA 737-739).

15

3. *Later in 1992, Parcel No. 1 was sold to Thomas M. Helms, Sr.*

In a deed dated October 14, 1992, the Wilson Lime Company conveyed Parcel No. 1 to Helms ("1992 Helms Deed").[9]  (JA 481).  The 1992 Helms Deed stated in its derivative clause that the property being conveyed was the same property conveyed in the 1902 Deed (Parcel No. 1).  Id.  The 1992 Helms Deed also stated that its intent was to convey "all of the property in this area owned by Wilson Lime Company, Inc. not previously conveyed in the" 1992 James River Deed.  Id.  Helms testified that it was his understanding when the 1992 Deeds were executed was that he was only receiving the mineral rights south of the Property and someone else owned the mineral rights on the Property.  (JA 1525-1527).

## III.    **Procedural Background**

Appellants filed this action in the Western District of Virginia and requested declaratory judgment and injunctive relief that Carmeuse was not permitted to quarry on the Property.  (JA 155).  Appellants also sought a temporary restraining order which was promptly denied.  (JA 5, 6, 32).  Subsequently, Helms intervened as a defendant, and all of the parties filed motions for summary judgment.  (JA 12-16, 331).  The Court granted Carmeuse and Helms summary judgment on Appellants' claims against them, and granted Helms summary judgment on his claims against Carmeuse. (JA 1742, 1774).

---

[9] The Helms Deed and the 1992 James River Deed are collectively referred to as the "1992 Deeds."

16

## SUMMARY OF ARGUMENT

The District Court correctly rejected the arguments by Appellants and ruled that the Yard Restriction in the 1849 Deed was unenforceable and Carmeuse and Helms own the entire Mineral Estate.  The District Court also rejected Appellants' assertion that Carmeuse and Helms be required to (a) use quarrying techniques from the 1850s and (b) quarry the limestone without disturbing the surface.  After rejecting Appellants' claims, the District Court erroneously and inconsistently divided the Mineral Estate between Carmeuse and Helms.

The Yard Restriction in the 1849 Deed states that no quarrying is allowed within an undefined "Yard."  The purpose of the Yard Restriction is to protect occupants of the attached home "from annoyance."  This Yard Restriction is unenforceable under the rule of repugnancy, its own express terms, the rules of deed interpretation, and the doctrine of changed circumstances.

Under the rule of repugnancy, a restriction is void when it conflicts with a broad granting clause and cannot be determined with reasonable certainty.  The Yard Restriction satisfies both of these conditions.  It conflicts with the broad granting clause which permits quarrying on the entire Property and fails to define either the boundary or the rights it protects.  Appellants' historical expert admits that the location of the Yard is unknown, and their title expert concedes that the Yard Restriction can be interpreted in at least two different ways.

17

The Yard Restriction is also void under its own terms.  The express purpose of the Yard Restriction is to protect the occupants of the dwelling house from annoyance.  This stated purpose confirms that the Yard Restriction was not intended to apply when the attached home could not be occupied.  Under the current zoning laws, the Property is zoned for mining and industrial use only and the only remaining structure on the Property cannot be occupied or used as a residence.

The Principles of Deed interpretation in Virginia law also support voiding the Yard Restriction.  The first principle is that any ambiguity, such as the Yard Restriction, must be interpreted in favor of the grantee (Carmeuse and Helms). The second principle is that the grantor (Appellants) is presumed to have conveyed all the property he is capable of conveying.

Although not relied on by the District Court, the Yard Restriction is also void under the doctrine of changed circumstances.   Under the doctrine of changed circumstances, a restriction is void when circumstances have changed so as "to destroy the essential objects and purposes of the [covenant]."   Chesterfield Meadows Shopping Center Associates, L.P. v. Smith, 264 Va. 350, 356 (2002)(internal citations and quotations omitted).   In this case, changed circumstances have clearly destroyed the purpose of the Yard Restriction, which

was to protect the occupants of the house.  The only structure on the Property is not by zoning allowed to be occupied or used as a residence.

Carmeuse and Helms own the entire Mineral Estate.  In their only argument on this issue, Appellants incorrectly claim that the 1901 and 1902 Deeds conveyed only a portion of the Mineral Estate.  Appellants' argument is contradicted by the plain language of the documents, the references to the Chancery Suit, and the references to the 1849 Deed.

Carmeuse and Helms are not restricted to quarrying techniques from the 1850s or underground quarrying.  When the Mineral Estate was created, the 1849 Deed did not place any restrictions on the type of quarrying techniques allowed.  Furthermore, the Supreme Court of Virginia has held that limestone can only be mined from the surface, and the grant of the right to quarry therefore anticipates the disturbance of the surface.  The Supreme Court of Virginia has also made it clear that modern quarrying techniques are permitted, although ironically in this case, the fundamental method of quarrying (by opening a pit and blasting) has remained the same since 1849.

The District Court erroneously ruled that Helms owned half of the Mineral Estate and then inconsistently later indicated that Helms owned more than half of the Mineral Estate.[10]   The District Court based its decision on the ambiguous

---

[10] Helms does not join in this paragraph of the Summary of the Argument.

"Half-the-Veins" Paragraph in the 1992 James River Deed, finding it to be unambiguous. This ruling by the District Court was contradicted by the plain language of the "Half-the-Veins" Paragraph, the opinion of both an expert surveyor and an expert geologist, and the District Court's own acknowledgment that a "geological survey" would be necessary to interpret the 1992 James River Deed. While the "Half-the-Veins" Paragraph was ambiguous, Carmeuse presented undisputed evidence of the surrounding circumstances which confirmed that Carmeuse owns all of the Mineral Estate except on the 300 Foot Strip.

## ARGUMENT

## I. <u>Standard of Review and Applicable Law</u>

### A. **Legal Standard of Review**

This Court "review[s] the district court's factual findings for clear error and its legal conclusions *de novo*." United States v. Bolander, 722 F.3d 199, 206 (4th Cir. 2013). "The ambiguity of a contract and the district court's grant of summary judgment are each questions of law that we review *de novo*." North Carolina Farm Bureau Mutual Insurance Company v. Clear Technology, Inc., 601 Fed. App'x 181, 185 (4th Cir. Feb. 4, 2015)(not reported).

**B.     Legal Principles for Deed Interpretation**

      1.     *The primary goal in interpreting a deed is to realize the parties' intention.*

When a court is asked to interpret and apply a deed, "[t]he prime consideration, as with any writing, is to determine the intention of the parties executing the instrument.  The intention, including a finding as to the estate conveyed, should be ascertained from the language used in the deed, if possible." Camp v. Camp, 220 Va. 595, 597 (1979).  Deeds or maps referenced in a deed are considered as part of the deed.  See Poindexter v. Molton, 237 Va. 448, 450 – 51 (1989); Auerbach v. County of Hanover, 252 Va. 410, 414 (1996).

      2.     *A court must first determine whether or not a deed is ambiguous.*

The Supreme Court of Virginia has explained that, in determining the parties' intention:

> [W]e initially confine our consideration to the four corners of the . . . deed to ascertain whether its language concerning mineral rights is plain and unambiguous. We have defined "ambiguity" as "the condition of admitting of two or more meanings, of being understood in more than one way."

CNX Gas Co. LLC v. Rasnake, 752 S.E.2d 865, 867 (Va. 2014) (quoting Berry v. Klinger, 225 Va. 201, 207 (1983)).

3.  *Ambiguous deeds may be interpreted using surrounding circumstances.*

When a deed is found to be ambiguous, parole or extrinsic evidence outside the four corners of the deed may be considered to resolve the ambiguity. The Supreme Court of Virginia recently explained that:

> Where, however, the language is obscure and doubtful, it is frequently helpful to consider the surrounding circumstances and probable motives of the parties.

CNX Gas Co. LLC v. Rasnake, 752 S.E.2d at 867.

4.  *Ambiguous deeds must be interpreted in favor of the grantee and against the grantor.*

In Virginia, "[w]here language in a deed is ambiguous, the language must be construed against the grantor and in favor of the grantee. . . . A grantor must be considered to have intended to convey all that the language he has employed is capable of passing to his grantee." Id. at 867 (internal citations omitted).

5.  *Ambiguous deeds may be resolved by the chain of title.*

This Court has stated that "[i]t is a well-settled principle of law that, if the terms of a deed are ambiguous or uncertain in describing the land conveyed, the courts will look back to prior deeds in the chain of title to secure the true description of the land." Davis v. Seybold, 195 F. 402, 412 (4th Cir. 1912)(applying this rule to resolve an ambiguous description in a deed by looking to the grantor's chain of title referenced in her deed).

22

      6.     *Ambiguous deeds must be considered as a whole and harmonized.*

The Supreme Court of Virginia has instructed courts to look at the deed as a whole.  <u>CNX Gas Co.</u>, 752 S.E.2d at 867.

      7.     *Ambiguous deeds must be interpreted to fit the land.*

The purpose of interpreting a deed is for a court to "fit the description to the land itself in order to ascertain 'what is conveyed, and where it is.'" <u>Smith v. Bailey</u>, 141 Va. 757, 768 (1925). When there is an ambiguity in fitting the description to the land, "it is the duty of the court to ascertain the intention of the parties as gathered from the description *as applied to the land* itself in the light of circumstances surrounding the parties at the time of the conveyance . . . ." <u>Id.</u> at 771 (emphasis in original).

## II.   **The District Court correctly ruled that the Yard Restriction is not enforceable.**

In the 1849 Deed, Carmeuse and Helms' predecessor in interest, Wilson, received all the Stone and Quarrying Rights on the Property. (JA 407, 419, 423).

The 1849 Deed also contained the "Yard Restriction," quoted below:

> And it is also agreed and understood between the parties, that the said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the inclosure [sic] of the yard attached to the said Reynolds' present dwelling house; this provision being inserted to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the occupancy of the house from annoyance.

(JA 409, 421, 424).

23

The District Court correctly ruled that the Yard Restriction is not enforceable against Carmeuse or Helms because (a) the Yard Restriction is void under the rule of repugnancy, (b) the parties to the 1849 Deed did not intend the Yard Restriction remain enforceable once the house could not be occupied; and (c) the general rules of deed construction support the unenforceability of the Yard Restriction.  The District Court's decision was also supported by the doctrine of changed circumstances.

**A.**    **The Yard Restriction is not enforceable under the rule of repugnancy.**

Historically, Virginia common law established a number of rules and principles for handling conflicts between clauses in the same legal documents, describing such clauses as "repugnant" to each other.  See Wornom v. Hampton Normal & Agric. Inst., 144 Va. 533, 541 (1926).  Among other rules, Virginia courts have historically held that a granting clause in a deed prevails over other conflicting clauses, including exceptions or reservations.  See Wolverton v. Hoffman, 52 S.E. 176, 177 – 178 (Va. 1905); Butcher v. Creel's Heirs, 50 Va. 201, 203 (1852).

More recently, the Supreme Court of Virginia has recognized that the modern rule is not to apply these repugnancy principles blindly, but to give effect to the parties' reasonably certain intent.  Goodson v. Capehart, 232 Va. 232, 236 (1986).  However, if that is not possible, the common law rules of repugnancy apply and, specifically, the granting clause prevails over a conflicting or "repugnant" clause elsewhere in the deed.  Id.

24

In 2014, the Supreme Court of Virginia again reiterated this rule, holding that:

> At common law, the granting clause always prevailed over language repugnant to it, but under the modern rule, the intent of the parties, *where clearly and unequivocally expressed,* will be given effect. When, however, it is impossible to discover with reasonable certainty the parties' intent from the language of the deed, the common law rule still applies and the granting clause prevails . . . That rule applies with particular force to exceptions in a deed that are repugnant to the granting clause. "An exception in a deed is always to be taken most favorably for the grantee, and if it be not set down and described with certainty, the grantee shall have the benefit of the defect."

CNX at 868 (internal citations omitted) (emphasis in original).

Thus, the rule of repugnancy provides that a restriction is void if: (1) the restriction is in conflict with (or repugnant to) a broad granting clause; and (2) the restriction is not defined with "reasonable certainty." The Yard Restriction satisfies both of these requirements, as the District Court correctly found.

### 1.    *The Yard Restriction conflicts with the granting clause in the 1849 Deed.*

The District Court correctly found that the Yard Restriction was in conflict with the "broad granting clause" in the 1849 Deed. In the 1849 Deed, the "broad granting clause" gives the grantee the right (among other things) to "quarry" and "take away" stone on the entire Property, while the Yard Restriction specifically states the grantee may not "quarry" and "take away" Stone in the Yard. (JA 419, 423).

In spite of this obvious conflict, Appellants argue that the rule of repugnancy does not apply because the Yard Restriction does not "nullify" or completely

contradict the granting the clause.  <u>See</u> Opening Brief pp. 36-40.  Under Appellants' interpretation, the rule of repugnancy only applies when the restriction completely nullifies the granting clause.  <u>Id.</u>

However, Virginia law plainly contradicts this argument.  As set forth above, the Supreme Court of Virginia has held that:

> If the land excepted or reserved cannot be determined with reasonable certainty, the exception is void and the grantee is vested with title **to the entire tract described, including the part sought to be excepted.**

<u>Chesapeake Corporation of Virginia v. McCreery</u>, 216 Va. 33, 37 (1975) (citing <u>Butcher v. Creel's Heirs</u>, 50 Va. 201, 203 (1852) (emphasis added).

In <u>Butcher</u>, the owner of a saw and grist mill had conveyed the mill along with five acres on which it was built, but reserved to himself the right to "build or erect a saw mill on the opposite side of the said river, or at the further end of the dam of the aforesaid saw and grist mill." <u>Butcher</u> at 202.  Subsequently, the owner's successor in interest tried to evict the purchaser from one acre of the property pursuant to the reservation. <u>Id.</u>  However, the Supreme Court of Virginia ruled that the exception was void for repugnancy, even though the reservation only conflicted with a portion of the property granted. <u>Id.</u> at 203.

26

2.    *The Yard Restriction cannot be determined with "reasonable certainty."*

Finally, the District Court found that the Yard Restriction cannot be determined with reasonable certainty because the 1849 Deed "is unclear as to exactly what the Yard Restriction was intended to reserve or restrict and through what type of property right." (JA 1753-1754). The facts supporting these findings are undisputed.

i.    The location of the Yard is not reasonably certain.

Appellants' expert, Dr. Daniel B. Thorp, conceded that the location of the Yard Restriction is not reasonably certain, stating:

> **Nor is it possible without a full archaeological survey of the property to say exactly what structures stood where. . . . Nor can we know exactly what Reynolds meant by "the enclosure of the yard attached to . . . the dwelling house."** It can be read, as Prof. Koons does, as "fenced in," but it can also be read to mean that the yard enclosed (i.e. surrounded) the house – with or without an actual continuous fence.

(JA 585, 587-88).

Both of Carmeuse's experts, Mr. McMurry and Dr. Koons, agreed with Dr. Thorp that it is probably impossible to determine the location of the Yard[11] and have

---

[11] Appellants incorrectly claim that it is undisputed that the Yard would "extend at least 50 to 70 feet from the house," incorrectly citing Dr. Koons' report. Opening Brief p. 34. Dr. Koons actually testified that the "precise size of the 'inclosure' attached to Reynolds' dwelling house cannot be known . . . ." (JA 1367). Hypothetically, if one were able to confirm the location of the home, then it was "reasonable to think" that the Yard would have extended "fifty to seventy feet or so in every direction from the dwelling house." Id.

27

further opined that they believe it likely that the stone structure standing on the Property is not the same dwelling house referred to in the 1849 Deed. (JA 409-410; 554-555). Thus, the Yard is unlike the reserved parcels in Yukon Pocahontas Coal Co. v. Ratliff, 181 Va. 195, 24 S.E.2d 559 (1943) and Benn v. Hatcher, 81 Va. 25 (1885) relied on by Appellants. Those parcels could be located with reasonable certainty. Ratliff, 181 Va. at 205; Benn, 81 Va. at 29. The Yard in this case cannot.

ii.    The rights conveyed by the Yard Restriction are not reasonably certain.

As the District Court noted, Appellants' own expert conceded "that the precise nature of the rights retained by the Yard Restriction is not clear on the face of the Deed." (JA 1753). Mr. Warner, Appellants' title expert, admitted that the Yard Restriction was "best seen as a reservation by the Grantor of the limestone in this area, but it may also be seen as the complete prohibition of any easement to enjoy the limestone estate in that area." (JA 1753). Putting aside the fact that neither interpretation is consistent with the plain language of the 1849 Deed, Mr. Warner confirmed that the Yard Restriction is not reasonably when certain when he admitted that the Yard Restriction could be interpreted in multiple different ways. See, e.g., Video Zone, Inc. v. KF&F Properties, L.C., 267 Va. 621, 626 (2004)(finding lease terms ambiguous because there were multiple interpretations of which party was responsible for HVAC system); Scott v. Walker, 274 Va. 209, 217 – 218

(2007)(finding term "residential purposes" ambiguous in restrictive covenant because it had multiple meanings).

Therefore, the reasonably uncertain Yard Restriction conflicts with the broad granting clause in the 1849 Deed and is void under the rule of repugnancy. Nevertheless, Appellants argue that the District Court should not have voided the Yard Restriction but instead should have "harmonized" the broad granting clause in the 1849 Deed with the Yard Restriction based on the parties' "clear" intent.  Opening Brief p. 43.   However, Appellants' experts have already expressly conceded that the parties' intent in the 1849 Deed is not clear.   Thus, the District Court could not "harmonize" the clauses without rewriting the 1849 Deed, an action clearly prohibited by Virginia law.

Appellants also argue at length that the District Court erred by relying on Bradley v. Virginia Ry. & Power Co., 87 S.E. 721 (Va. 1916) and CNX Gas Co. to support its application of the rule of repugnancy.  Opening Brief pp. 40-42, 44-46.  As Appellants note, neither Bradley nor CNX expressly applied the rule of repugnancy (although both recited it as Virginia law). Bradley, 87 S.E. at 723; CNX Gas Co., 752 S.E.2d at 868.  However, this argument misstates the District Court's holding.  The District Court relied on the facts in Bradley and CNX when it found the Yard Restriction void because its purpose was impossible, not when it found the Yard

Restriction void under the rule of repugnancy. (JA 1753-1759). This finding is addressed in the section B below.

Finally, Appellants argue that the District Court's application of the rule of repugnancy "threatens the validity of any express limitation in any deed." Opening Brief p. 49. Yet again, Appellants misstate the District Court's finding. The District Court did not rule that all "express limitations" were void. Instead, it merely applied the rule of repugnancy and found that Yard Restriction was void because it was not reasonably uncertain and it conflicted with the granting clause. (JA 1757-1759).

**B.  The Yard Restriction is not enforceable because its purpose (protecting occupants) is now impossible.**

The District Court also correctly found that the purpose of the Yard Restriction was to protect occupants, a purpose that could no longer be accomplished due to the zoning of the Property. <u>Id.</u> According to the District Court, the parties to the 1849 Deed did not intend for the Yard Restriction to apply once its purpose had been fulfilled and it was therefore unenforceable. <u>Id.</u>

   *1. <u>The Yard Restriction's purpose was to protect the occupants of Reynolds' house from annoyance</u>*.

The Yard Restriction expressly states its purpose as follows:

This provision being inserted to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the **occupancy of the house from annoyance.**

(JA 421, 424) (emphasis added).

30

The District Court correctly recognized that Virginia law required it to take into account this explanatory phrase when interpreting the parties' intent in the Yard Restriction. (JA 1757).

Appellants do not contest, as they cannot, that the purpose of the Yard Restriction was to protect the "occupan[ts] of the house from annoyance." Nevertheless, they claim that the District Court's decision was prohibited by the law of the case doctrine because the District Court had previously denied a Motion to Dismiss by Carmeuse and held in that the Yard Restriction was not "contingent" on occupancy. Opening Brief p. 35. This argument has no merit.

As a preliminary matter, the District Court orders in this matter have been consistent. In the initial order (which denied Carmeuse's Motion to Dismiss), the District Court did state that the Yard Restriction was not conditioned on occupancy, but then went on to hold that the occupancy clause "explains why that restriction is inserted." (JA 218). In its final order, the District Court again confirmed both of these rulings. (JA 1757). It expressly found that that the Yard Restriction was not conditioned on occupancy, but also found that the Yard Restriction had to be interpreted in light of its stated purpose – to protect the occupants of the dwelling house. Id.

Furthermore, the law of the case doctrine does not apply here. The District Court's prior order was an interlocutory order which is "'subject to reconsideration

at any time prior to the entry of a final judgment.'" <u>American Canoe Association, Inc. v. Murphy Farms, Inc.</u>, 326 F.3d 505, 515 (4th Cir. 2003).  The power to reconsider such an order "is committed to the discretion of the district court . . . and doctrines such as law of the case . . . have evolved as a means of guiding that discretion . . . ." <u>American Canoe</u> at 515.

### 2. <u>*The only structure currently on the Property cannot be occupied under the zoning laws of Botetourt County.*</u>

The Yard Restriction protects the "inclosure [sic] of the yard attached to said Reynolds present dwelling house."  The location of that Reynolds' present dwelling home is unknown.  While Appellants argue that Reynolds' dwelling house is the same structure currently on the Property, there is no evidence of that, save for conclusory statements by Appellants' counsel and to a much lesser extent, their expert.  <u>See</u> Opening Brief p. 7.

Furthermore, Appellants are forced to concede that the only remaining structure has not been occupied for thirty years and cannot be occupied under modern zoning laws.  (JA 1743).  Thus, the Yard Restriction "if it were ever valid at all—is no longer a valid reservation." (JA 1758).

Nevertheless, Appellants argue that the District Court should not have considered the zoning of the Property because the Property was not zoned in 1849. Opening Brief p. 47.  This simplistic argument ignores the reason the District Court considered the zoning – to determine if the structure on the Property could

be occupied. While zoning is not relevant to discern the parties' intent in 1849, it is certainly relevant to determine if the purpose of the Yard Restriction is no longer possible.

Appellants also argue that the District Court should not have considered the zoning of the Property based on the prevention doctrine. Opening Brief p. 48. "The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused." Moore Brothers Company v. Brown & Root, Inc., 207 F.3d 717, 725 (4th Cir. 2000).

The District Court correctly noted (as Carmeuse had argued) that the prevention doctrine is a contract law principle. (JA 1759). It does not apply to property rights. Moreover, there is no evidence of any agreement by Carmeuse to allow the rezoning of the Property or any objection by Carmeuse to Appellants' proposed rezoning. Even if Carmeuse had objected, it would have been well within its rights to protect its use of its property.

Finally, Appellants argue that the structure on the Property is not abandoned. Opening Brief p. 46. It is not clear what Appellants means by abandoned. This "house" is a one room structure, with no plumbing, no electricity, and no water or sewer. (JA 1743). Appellants have never occupied the Property and now live in Ohio. Id. More importantly, there is no dispute that the structure has not been

occupied since 1999 and now may not be occupied under the local zoning ordinances. Id.

       3.    *The parties to the 1849 Deed did not intend the Yard Restriction to be enforceable when Reynolds home was not occupied.*

After noting the purpose of the Yard Restriction and the fact that the dwelling house could no longer be occupied, the District Court correctly held that:

> It would be a strained interpretation of the language to allow it to carve out of the midst of the limestone estate an untouchable "Yard" that could pass to the heirs or assigns of the grantors after it had been abandoned as a Yard and dwelling house.

(JA 1759).

The District Court noted that its decision was on point with the Supreme Court of Virginia decision in <u>Bradley v. Virginia Ry. & Power Co.</u>, 87 S.E. 721 (1916). (JA 1756). In <u>Bradley</u>, a grantor conveyed 600 acres of land, but reserved "a family burying ground and also the servants' burying ground." <u>Bradley</u>, 87 S.E. at 721. The grantor died without heirs and no one was buried in the cemetery. Id. The court held:

> It would, we think be a strained, if not unwarranted construction of the language, under the facts and circumstances, to hold that it was intended thereby to care out of the midst of this estate a quarter of an acre that would pass to the heirs of the granter after it had been abandoned as a graveyard . . . .
>
> Id. at 723.

34

The District Court's ruling is also supported by <u>CNX Gas Co.</u> wherein the Supreme Court of Virginia interpreted a reservation of mineral rights based on the following sentence which stated its purpose.  The deed in <u>CNX Gas Co</u>. granted fee simple rights to a certain parcel and then stated the following:

> This sale is not ment [sic] to convey any coals or minerals.  The same being sold and deeded to other parties heretofore.

<u>CNX Gas Co.</u>, 752 S.E.2d at 866.

The court found that the first sentence had to be interpreted in light of the second sentence, and held that the reservation only reserved that coal and minerals which had been previously sold and deeded to other parties. <u>Id.</u> at 868.

Again, Appellants concede (by not contesting) that the parties did not intend the Yard Restriction to be enforceable once its purpose was impossible.  Nevertheless, in a final attempt to escape the plain language of the 1849 Deed, Appellants argue that the rule against perpetuities somehow bars Carmeuse and Helms' right to quarry in the Yard.  Opening Brief p. 49.  The common law rule against perpetuities does not apply to restrictive covenants such as the Yard Restriction.  <u>See</u> <u>State v. Reece</u>, 374 S.W.2d 686 (Tex. Civ. App. 1964); <u>McKinnon v. Neugent</u>, 225 Ga. 215, 216 (1969) (citing <u>Reeves v. Comfort</u>, 172 Ga. 331 (1931)); <u>Kilpatrick v. Twin States Realty Co., Inc.</u>, 193 Miss. 599, 10 So. 2d 447, 449 (1942) (citing 14 Am.Jur. 17, Covenants, etc., § 206 (currently 20 Am.Jur. 2d, Covenants, etc., § 165)).  Also, the Yard Restriction is in the nature of a contractual right, not a vesting property interest, and the rule against

perpetuities does not apply to such contractual rights.  See W. D. Nelson & Co. v. Taylor Heights Dev. Corp., 207 Va. 386, 391 (1966).  Accordingly, there can be no dispute that the parties did not intend the Yard Restriction to apply once the dwelling house was not occupiable.

### C.    The Yard Restriction is not enforceable under the general rules of deed construction.

The Yard Restriction is ambiguous both as to what property it covers and what type of rights it is intended to convey.    Under Virginia law, ambiguous deeds are interpreted against the grantor (Appellants' predecessor in interest) and in favor of the grantee (Helms and Carmeuse's predecessor in interest).  CNX Gas Company, LLC v. Rasnake, 752 S.E.2d at 867 – 868.

Furthermore, a grantor (such as Appellants' predecessor in interest) is presumed to have conveyed all that the language he has employed is capable of passing to the grantee. Id.

Finally, the Yard Restriction is clearly a restriction on the free use of property. Under Virginia law, such restrictions are disfavored and must be strictly construed; any ambiguity in such a restriction must be resolved in favor of the free use of property.  Chesterfield Meadows Shopping Center Associates, L.P. v. Smith, 264 Va. 350, 355 (2002).

All of these rules of construction support the District Court's ruling that the Yard Restriction is unenforceable.

**D.** **The Yard Restriction is not enforceable under the doctrine of changed circumstances.**

Although the District Court did not rule on this ground, its decision to find that the Yard Restriction was void is also supported by the doctrine of changed circumstances. In Virginia, a restrictive covenant or other restriction on property rights is void when circumstances have changed so as "to destroy the essential objects and purposes of the [covenant]." Id. at 356; accord Quality Properties Asset Management Company v. Trump Virginia Acquisitions, LLC, 2012 WL 3542527 at *12 (W.D. Va. Aug. 16, 2012).

In this case, the purpose of the Yard Restriction is "to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the occupancy of the house from annoyance." (JA 424). In the more than 160 years since that restrictive provision was written, circumstances have changed so radically as to destroy the essential objects and purposes of the Yard Restriction. The stone structure, even if it were the dwelling home mentioned in the 1849 Deed (it is not; see (JA 554-555)), has not been inhabited in many years, is in disrepair, has no water or electricity to support human occupancy, and cannot be occupied under zoning laws. (JA 1743). Thus, circumstances have so radically changed that no one is able "seriously to entertain the notion that any purpose consistent with the covenant [to protect the occupants of the house] would be served by permitting the restriction imposed thereby on the use of [the] property to continue."

37

### III.   The District Court correctly ruled that the 1901 and 1902 Deeds conveyed the entire Mineral Estate.

The 1901 and 1902 Deeds conveyed the entire Mineral Estate. This conveyance is confirmed by the plain language of the deeds themselves, the chancery suit referenced by the deeds, and the principles of deed construction.

### A.    The plain language of the 1901 and 1902 Deeds confirms that they conveyed the entire Mineral Estate.

The 1901 Deed conveyed the following:

**Also the right to all the limestone on the land of the late G.B.W. Reynolds, now in the name of Lavinia Pitzer,** adjoining the above lands, and along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from the line of the E. Dillon land, together will [*sic*] all the rights of ingress, egress, and regress, and all the privileges and rights of quarrying, and using, and burning, and removing **the stone on this Pitzer, or Reynolds, land, accorded said John S. Wilson in the deed recorded in [the 1849 Deed] …. All of which properties and rights, are described in the papers of the [chancery proceeding], as "Parcel no. 2."**

(JA 413, 441-442) (emphasis added).

The 1902 Deed conveyed the following:

**[A]ll the stone on the land of Lavinia Pitzer, from line of "parcel no. 2,"** (which parcel has heretofore been conveyed by said commissioner to the parties of the second part, by deed of date the 23d day of December 1901) thence South West to E. Dillon's line; together with all rights of ingress, egress and regress to said lands, and all other rights and appurtenances, as to quarrying, and burning said stone, and **all other rights as to said stone,** and said land, now owned by the heirs of Lavenia Pitzer, which rights &c, **were conveyed to said John S. Wilson by G.B.W. Reynolds in [the 1849 Deed].**

(JA 414, 445) (emphasis added).

38

Both deeds confirm that the Stone was being conveyed, and both deeds state that they are conveying the Stone and Quarrying Rights conveyed to Wilson in the 1849 Deed.

Nevertheless, Appellants argue that the parties intended only to convey a portion of the Mineral Estate. Opening Brief pp. 54-60. As evidence, Appellants point to the use of the term "limestone," the use of the phrase "along the vein of grey limestone" and the reference to Dillon's property in the 1901 Deed. As the District Court correctly found, there is no basis in these claims. (JA 1765).

> 1.    *The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by using the term "limestone."*

According to Appellants, the 1901 and 1902 Deeds only conveyed the limestone in the Mineral Estate. While both the 1901 and 1902 Deeds refer to "limestone" on the Property, the parties did not intend that term to limit the grant of the Mineral Estate as Appellants suggest. Instead, the parties used the term "limestone" to describe various properties owned by Wilson because limestone was what made those properties valuable. (JA 1765). The Chancery Court even used the term "limestone" to refer to all of Wilson's properties, not because it wished to limit the fee simple conveyance of those properties, but because limestone was what made the properties valuable. (JA 429, 439, 443)

Further, limestone is the only type of stone on the Property. The Property has different formations or veins of stone consisting of both high calcium limestone and a

lower calcium limestone sometimes referred to as dolomite. For purposes of the summary judgment motion, the District Court accepted that "limestone" did not include "dolomite." (JA 1762-63). However, as the District Court noted, this Court has previously recognized that the use of the term "limestone" includes "dolomite." Id. (citing James River Hydrate & Supply Co. v. United States, 337 F.2d 277 (4th Cir. 1964)).

> There is substantial evidence that dolomite is only a subclass of limestone. The word is useful in indicating its magnesium content and distinguishing it from other limestones having very high calcium carbonate content, but the evidence indicates that neither historically, geologically nor industrially may dolomite be divorced from the general class of rock known as limestone.

James River at 279.

Carmeuse also produced undisputed evidence that the term "limestone" was used to include dolomite in 1904. (JA 524). Thus, the reference to limestone in the 1901 and 1902 Deeds was merely a recitation of fact that the only stone on the Property was limestone.[12]

---

[12] Appellants relied on the statement by Carmeuse's quarrying expert that dolomite had been distinguished from high calcium limestone in the late 1800's. Opening Brief p. 19. The same expert later concluded that the phrase "vein of grey limestone" "may also have referred" to the dolomite. (JA 507).

2. *The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by using the phrase "along the vein of grey limestone."*

Next, Appellants argue that the parties to the 1901 and 1902 Deeds intended to only convey a portion of the Mineral Estate because they used the phrase "along the vein of grey limestone" in the 1901 Deed. Opening Brief p. 58-59. Putting aside the parties' very clear manifestation of their intent as discussed above, Appellants take this phrase completely out of context and ignores the nature of limestone.

As a preliminary matter, the 1902 Deed does not contain the phrase "along the vein of grey limestone." (JA 444). If the parties had wished that phrase to be used as a limitation on the type of stone conveyed, they certainly would have included it in both deeds.

Furthermore, the parties to the 1901 Deed used the phrase in the context of establishing the 300 Foot Line.

> Also the right to all the limestone on the land of the late G.B.W. Reynolds, now in name of Lavinia Pitzer, adjoining the above lands, **and** along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from the line of the E. Dillon land….

(JA 441) (emphasis added).

There are two parts to this deed description: a general grant and the 300 Foot Line description. The general grant and this description are separated by the

"and."   The phrase "along the vein of grey limestone" is clearly part of the description of the location of the 300 Foot Line, not the general grant in the 1901 Deed.  The phrase describes the direction from which the 300 Foot Line was to be measured – "along the vein of grey limestone . . . in a southwesterly direction . . . ."   Had the parties intended the reference to be a limitation, they would have included it in the general grant and used words of limitation (such as "only the limestone on the vein of grey limestone is conveyed").   Instead, the parties used words of direction ("along" and "in a southwesternly direction") because they intended the phrase to be used as a directional guide, not a limitation on the type of stone being conveyed.

This "along the vein of grey limestone" phrase was used in a similar fashion by both the Chancery Court and its Special Commissioners in the Chancery Suit. The Chancery Court ordered that:

> [T]he division line between the two parcels… is to run three hundred (300) feet from the division line between E. Dillon heirs [sic], and the Pitzer [Reynolds] Tract **along the vein of grey limestone in a North Easterly Direction**….
>
> (JA 431, 433) (emphasis added).

In this Order, the Chancery Court clearly uses the phrase "along the vein of grey limestone" to show how the 300 Foot Strip is to be calculated.  The Special Commissioners used the phrase "along the vein of grey limestone" in a similar manner in their Additional Special Terms of Sale.  (JA 429).  Thus, read in context,

42

the phrase "along the vein of grey limestone" does not limit the conveyance of the Mineral Estate to certain types of stone.

In addition to the context of the 1901 Deed, Appellants' argument regarding the phrase "along the vein of grey limestone" is contradicted by the nature of limestone. All limestone is grey, and there are multiple (four) grey limestone formations on the Property. (JA 507). Thus, the phrase "vein of grey limestone" could have referred to any of the formations on the Property. The parties to the 1901 and 1902 Deeds were owners and operators of several limestone quarries. (JA 408). It strains credulity to argue, as Appellants did, that they would have made such a mistake.

> 3.     _The parties to the 1901 and 1902 Deeds did not intend to limit the conveyance of the Mineral Estate by referring to "Dillon's heirs."_

Finally, Appellants argue that the 1901 and 1902 Deeds did not convey all of the Mineral Estate because the 1901 Deed includes a reference to "Dillons' heirs." Opening Brief pp. 15-16. The 1901 Deed describes the 300 Foot Line as extending 300 feet from the division line between the Property and the property of "Dillons' heirs." (JA 441). Appellants argue that Dillon only owned one of the two parcels on the Property's southwestern border and therefore, the parties to the 1901 and 1902 Deed only intended to convey a portion of Mineral Estate. Opening Brief pp. 15-16.

43

Once again, this argument has no basis. Similar to the phrase "along the vein of grey limestone," the parties to the 1901 Deed included the reference to "Dillons' heirs" to describe the 300 Foot Line, not to limit the amount of stone conveyed. See *supra*. Mr. McMurry was the only expert surveyor to opine on the meaning of this legal description, and he clearly stated that the reference to Dillon is "merely a location and orientation reference, not a limitation on the property conveyed in the 1901 Deed." (JA 1503-04). Further, Appellants were wrong when they claimed that Dillon only owned one of the two parcels which shared a southwestern border of the Property. Mr. McMurry also testified that he confirmed that Dillon had, at one point, owned both parcels on the Property's southwestern border. (JA 1503-04).

Thus, the plain language of the 1901 and 1902 Deeds confirms that the parties to those deeds intended to convey the entire Mineral Estate.

**B.    The references to the Chancery Suit in the 1901 and 1902 Deeds confirm that they conveyed the entire Mineral Estate.**

The 1901 and 1902 Deeds were entered into and delivered based on orders in the Chancery Suit and both deeds refer to the Chancery Suit repeatedly. The orders and pleadings in the Chancery Suit confirm that the parties to the 1901 and 1902 Deeds intended to transfer the entire Mineral Estate.

1.    *The Chancery Court defined Parcel No. 1 and Parcel No. 2 as containing the entire Mineral Estate.*

Parcel No. 1 and Parcel No. 2 are defined in the Chancery Suit as follows:

Parcel no. 1:-       …**This parcel includes also the stone rights on the D.L. Pitzer tract for a distance of three hundred feet from the division line between E. Dillon's heirs and the Pitzer tract,** along the vein of grey Limestone in a north-easterly direction…

Parcel No. 2:-       …**and all the stone and mineral rights on the Pitzer land North-East of the line of division between this tract and no. 1 set out above under description of tract no.1…**

(JA 410-411, 429) (emphasis added).

In the Chancery Suit, both parcels were advertised for sale and described as "embrac[ing] about 486 acres of land with the right to quarry stone on 200 acres additional on what is known as the Pitzer tract." (JA 412, 435-436). Thus, there can be no dispute that Parcel No. 1 and Parcel No. 2 contained the entire Mineral Estate.

2.    *The 1901 and 1902 Deeds both state that they are conveying Parcel No. 2 and Parcel No. 1 respectively.*

The 1901 Deed states that "all of which properties and rights [conveyed in the 1901 Deed] are described in the papers of [the Chancery Suit] as "Parcel no. 2." (JA 441). The 1902 Deed states that "the property hereby conveyed includes all that property sold to said Louise W. Turpin in said proceedings and described therein as 'Parcel no. 1.'" (JA 444). As discussed above, Parcel No. 1 and Parcel

45

No. 2 contained the entire Mineral Estate. By referencing both Parcels, the parties to the 1901 and 1902 Deeds clearly intended to convey the entire Mineral Estate.

> 3.     *The Chancery Court ordered that Parcel No. 2 be conveyed in the 1901 Deed and Parcel No. 1 be conveyed in the 1902 Deed.*

The parties to the 1901 and 1902 Deeds began each deed by reciting that the grantor is a Commissioner in Chancery who is conveying the property referenced in each deed pursuant to an order of the Chancery Court.   (JA 441, 444).  These recitals correspond with the orders of the Chancery Court.  On October 11, 1901, the Chancery Court ordered that "parcel no.two [sic]" be conveyed to Louise Turpin (the "1901 Order").  (JA 439-440).  On December 23, 1901, the Special Commissioner complied with the 1901 Order and delivered the 1901 Deed, which expressly referenced the 1901 Order, and stated it was conveying Parcel No. 2. (JA 439, 441, 443).

In May of 1902, the Chancery Court ordered that "parcel no 1" be conveyed to Louise Turpin (the "1902 Order").  On July 26, 1902, the Special Commissioner complied with that 1902 Order and delivered the 1902 Deed, which expressly stated that it was conveying Parcel No. 1.  (JA 443, 444).

By referencing these orders, the parties confirmed their intent to convey the entire Mineral Estate.

*4.    The parties to the 1901 and 1902 Deeds and the Chancery Suit
intended to convey the entire Mineral Estate.*

There can be no dispute that when the parties referred to the Chancery Suit, they intended to confirm that they were conveying the entire Mineral Estate. To find otherwise, as Appellants argue, would mean that (a) the Chancery Court's orders were ignored, (b) the purchaser received less property than was advertised, and (c) the Special Commissioner (who was the attorney for the purchaser) failed to convey to his clients all of the property to which they were entitled under the law.

**C.    The principles of deed construction confirm that the 1901 and 1902 Deeds conveyed the entire Mineral Estate.**

As set forth above, Virginia law requires that any ambiguity be interpreted in favor of the grantee, and a grantor is presumed to have conveyed all that the language he has employed is capable of passing to the grantee. Applied to the 1901 and 1902 Deeds, these principles require that any ambiguity must be interpreted in Carmeuse and Helm's favor.

**IV.    The District Court correctly held that Carmeuse and Helms have the right to disturb the surface of the Property and quarry the Stone using modern technology.**

As stated above, the 1849 Deed granted to Carmeuse and Helms' predecessor in interest all the Stone and Quarrying Rights.   (JA 420-421, 424).

47

The 1849 Deed does not contain any limitation on the method of quarrying or the disturbance of the surface (JA 421, 423).

Nevertheless, Appellants argue that Carmeuse and Helms do not have the right to disturb the surface of the Property and may only use quarrying technology that was available in 1849. Opening Brief pp. 50-54. Appellants' sole justification for this argument is their contention that Reynolds would not have contemplated the size of modern mining techniques. See Id.

To put it another way, Appellants are upset that Carmeuse and Helms might take all of the stone they own. According to Appellants, if Reynolds had known that the purchaser would quarry all of the stone in the Mineral Estate, he never would have sold it. See Id. Besides being absurd on its face, Appellants' argument is contradicted by the unchanged method of limestone quarrying, the plain language of the 1849 Deed, and Virginia law on use of modern technologies and disturbing the surface.

**A.    The method of quarrying limestone has not changed fundamentally since the 1849 Deed.**

Limestone quarrying methods have remained fundamentally the same since 1849. As the Supreme Court of Virginia has noted:

> In this country it [limestone] is a part of the soil, and a conveyance that reserves the limestone with the right to remove it would reserve practically everything and grant nothing. The only way it is removed, or can be removed, is by quarrying, which requires the taking off of

48

any top soil that may lie above it and blast it off. There is nothing left when the limestone is taken.

Beury v. Shelton, 151 Va. 28, 41 (1928).

Mr. Hans Naumann, Carmeuse's quarrying expert, described in detail the process of quarrying in 1849. First, a limestone quarrier dug a hole in the limestone, and filled it with black powder or nitroglycerine. The quarrier then set off the explosives which broke off pieces of the limestone. These chunks of rock were collected and then transported to "lime kilns or iron furnaces." (JA 499-501). The quarrier in 1849 may well have used mechanical mining tools, including steam engines, for both the quarrying and the subsequent transportation of the limestone. Id. (JA 499-501).

The explosions in the quarrying process were dangerous, dropping pieces of rock on nearby properties and "causing injury and death." Id. The entire quarrying process would also have eroded the soil, polluted the groundwater and created noise, dust, soot and smog. (JA 499-501).

Today, the process is very similar, although the equipment and technology have improved, resulting in a far less invasive and destructive procedure. (JA 499-501). In short and contrary to Appellants' arguments, Reynolds would have expected far worse consequences than Appellants will incur from modern quarrying techniques.

Appellants' arguments to the contrary have no basis, as evidenced by the lack of citations supporting them.  See Opening Brief p. 10.  Moreover, they are contradicted by the evidence.  For example, Appellants allege in the Opening Brief that "neither Reynolds nor Wilson contemplated Carmeuse's current benching techniques."  Opening Brief p. 51.  Mr. Naumann directly contradicted that claim when he stated that benching "has been utilized since the quarrying activities of the ancient Romans and Greeks. Benching or terracing, was considered one of the fundamental rules of surface excavation in 1854." (JA 500-501).

### B.    The 1849 Deed confirms that Carmeuse and Helms have the right to disturb the surface of the Property.

The parties to the 1849 Deed clearly anticipated that the surface of the Property as would be disturbed by: (a) expressly permitting "quarry[ing]" and (b) prohibiting quarrying in the Yard and awarding compensation if crops were destroyed.  As mentioned above, the Supreme Court of Virginia has recognized that quarrying disturbs the surface of the Property.[13]  Beury v. Shelton, 151 Va. 28, 41, 144 S.E. 629, 633 (1928).  By expressly allowing quarrying, the parties clearly expected the surface of the Property to be disturbed.

---

[13] Reynolds and Wilson (the parties to the 1849 Deed) both had experience with limestone quarrying and would have certainly been very familiar with the process of quarrying limestone from the surface.  (JA 408).

In addition, the 1849 Deed provided for protection for a "Yard" and compensation for damaged crops.  (JA 419, 423).  If the parties did not expect a disturbance of the surface, there would have been need for these protections.

## C.    Virginia law confirms that Carmeuse and Helms have the right to disturb the surface of the Property.

As discussed above in <u>Beury v. Shelton</u>, the Supreme Court of Virginia has held that limestone is part of the surface and limestone quarrying requires the destruction of the surface.  <u>Beury</u> at 41.  Courts in Kentucky have quoted this language with approval.  <u>See</u>, <u>e.g.</u>, <u>Little v. Carter</u>, 408 S.W.2d 207, 209 (Ky. 1966); <u>Rudd v. Hayden</u>, 265 Ky. 495, 97 S.W.2d 35, 36 (1936).

Courts in other states have also confirmed that limestone is part of the surface.  <u>Atwood v. Rodman</u>, 355 S.W.2d 206, 214 (Tex. Civ. App 1962) (limestone is "a rock-like part of the surface");  <u>Heinatz v. Allen</u>, 147 Tex. 512, 518, 217 S.W.2d 994, 997 (1949) (limestone "is reasonably and ordinarily considered a part of the soil.");  <u>White v. Miller</u>, 200 N.Y. 29, 36 (1910) ("limestone was part of the surface of the land"); <u>Save Our Little Vermillion Env't, Inc. v. Illinois Cement Co.</u>, 311 Ill. App. 3d 747, 750, 752, 725 N.E.2d 386, 390 (2000)("Limestone . . . cannot be mined without destroying the surface."); <u>Kinder v. La Salle Cnty. Carbon Coal Co.</u>, 310 Ill. 126, 134, 141 N.E. 537, 540 (1923); <u>Campbell v. Tennessee Coal, Iron & R. Co.</u>, 265 S.W. 674, 676 (Tenn.

1924)("[B]y quarrying the limestone the entire surface would be made way

with."); <u>Rudd v. Hayden</u>, 265 Ky. 495, 97 S.W.2d 35, 36 (1936).

Thus, under Virginia (and other states') law, the right to quarry limestone on

the Property gives Carmeuse and Helms the right to disturb the surface of the

Property.[14]

### D. Virginia law confirms that Carmeuse and Helms have the right to use modern quarrying techniques.

Virginia Courts have recognized that technology improves over time and

have encouraged the use of modern mining techniques. For example, the Supreme

Court of Virginia in <u>Oakwood Smokeless Coal Corp. v. Meadows</u>, 184 Va. 168,

175 (1945), quoted with approval the following recitation about progress in

mining:

> The incidental rights of the miner which are appurtenant to the grant
> of the mineral, are to be gauged by the necessities of the particular
> case, and therefore vary with changed conditions and circumstances.
> He may occupy so much of the surface, adopt such machinery and
> modes of mining and establish such auxiliary appliances as are
> ordinarily used in such business, as may be reasonably necessary for
> the profitable and beneficial enjoyment of his property. **But he is not
> limited, as we have already said, to such appliances as were in**

---

[14] Appellants argue that the District Court's ruling is erroneous because it affects the rights of third-parties who own easements over the Property. Opening Brief, p. 61. But, these parties will not be bound by the District Court's ruling. "[J]udgments generally bind only parties and privies and are 'not conclusive upon other persons, because it would be unjust to bind one by a proceeding in which he had no opportunity to make defense . . .'" <u>Am. Safety Cas. Ins. Co. v. C.G. Mitchell Const., Inc.</u>, 268 Va. 340, 349-50, 601 S.E.2d 633, 638 (2004)(internal citations omitted).

**existence when the grant was made, but may keep pace with the progress of society and modern inventions.**

Id. at 175 (quoting Williams v. Gibson, 84 Ala. 228, 233–34 (1888)) (emphasis added); accord Yukon Pocahontas Coal Co. v. Ratliff, 181 Va. 195, 205, 24 S.E.2d 559, 563–64 (1943).

This principle is in accord with other Virginia rulings regarding progress. For example, Virginia courts have found that grants of rights-of-way are not restricted to the type of vehicle existing at the time the right-of-way was granted. Wagoner v. Jack's Creek Coal Corp., 199 Va. 741, 744, 101 S.E.2d 627, 629 (1958) (allowing hauling by truck on a "wagon" easement).

In spite of this plain law, Appellants argue that Carmeuse is prohibited from using modern quarrying techniques. Opening Brief p. 50. Appellants rely on the case Phipps v. Leftwich, 216 Va. 706, 707–10, 222 S.E.2d 536, 537–39 (1976). Opening Brief pp. 50-54. However, Phipps confirms the principle stated in Yukon and Meadows. In Phipps, coal and mineral rights had been granted in several deeds in 1902, when surface mining of coal was unknown. In 1976, the successor to those rights was attempting to mine the coal using a strip mining method. Id. at 708, 538. After citing Meadows and Yukon approvingly, the court in Phipps stated:

> Appellants may, of course, take advantage of developments in the operation of underground mines which modern technology may make

53

available.    Improvements in mining machinery, power, lighting, ventilation, transportation, and safety facilities may be utilized.

Id. at 713, 541.

The court in Phipps then went on to find that because "the parties to the 1902 deed contemplated only underground mining of coal . . . the grantee and its successors may employ surface mining methods only with the consent of the owners of the surface." Id. at 715, 542.  The Court specifically stated:

We express no opinion as to the use of surface mining methods to remove other minerals or stone, because that question is not before us.

Id. at 715, 542.

Of course, the facts in this case are completely inapposite from the facts in Phipps.  Unlike coal, which was only mined underground in 1902, limestone and stone have historically been mined from the surface. (JA 499); see also Beury v. Shelton, 151 Va. 28, 41, 144 S.E. 629, 633 (1928).  In Phipps, the Court was concerned by the change to an entirely different type of mining (underground versus strip mining).  Here, the change alleged by Appellants is based on the scale of the mining and the amount of limestone to be removed.  See Opening Brief pp. 50-54.  Thus, Phipps is inapplicable and Carmeuse and Helms are entitled to "take advantage of developments . . . which modern technology may make available." Phipps, 216 Va. at 713.

## V.    The Court incorrectly and inconsistently ruled that the 1992 Deeds conveyed one half of the Mineral Estate to Helms and one half to Carmeuse.[15]

In addition to dismissing Appellants' claims, the District Court erroneously granted Helms summary judgment on its claim against Carmeuse. Helms and Carmeuse both agree that until 1992 all of the Mineral Estate was owned by their predecessor in interest, the Wilson Lime Company. In 1992, Helms and Carmeuse received the entire Mineral Estate from the Wilson Lime Company. On all this, they both agree and the District Court so found. See (JA 1766).

Helms and Carmeuse also agree that the two applicable deeds in 1992 are the 1992 James River Deed and the 1992 Helms Deed. See (JA 1767). The 1992 James River Deed states that it is conveying to Carmeuse the same property that was conveyed in the 1901 Deed (Parcel No. 2 – all of the Mineral Estate except for that portion on the 300 Foot Strip). See (JA 477). The 1992 Helms Deed states that it is conveying to Helms the same property that was conveyed in the 1902 Deed (Parcel No. 1 –the Mineral Estate on the 300 Foot Strip). See (JA 481). These references in the 1992 Deeds are consistent with the prior conveyances in the chain of title.

Yet, Helms argues that he received more than what was conveyed in the 1902 Deed. His argument is based on the ambiguous "Half-the-Veins" Paragraph in the 1992 James River Deed which follows the reference to the 1901 Deed and states:

---

[15] Helms does not join in this section of the Brief.

The party of the first part further grants unto the party of the second part all of the mineral rights including all rights and privileges necessary to quarry and remove the stone, on half the veins of limestone on a 200 acre tract of land belonging to G.W. Webster, and adjoining the said 306 acre tract; said half to be measured along the veins of limestone from the division line of said 306 acre tract in a southwesterly direction….

(JA 478-79).

According to Helms, this "Half-the-Veins" Paragraph requires that the Mineral Estate be divided as follows:

"The veins of limestone" [in the "Half-the-Veins" Paragraph] are precisely identified as two linear, adjacent and approximately parallel formations of valuable high calcite limestone known as the "New Market formation" and the "Lincolnshire formation"… These limestone formations may be located by a geological technique known as mapping the "strike lines" between points at which the formations are observed at the surface of the earth and points at which the formations are located by the geological drilling conducted by Carmeuse. The strike lines will fix the locations at which the formations are intersected by the north boundary and the south boundary described above. The reference line with which to locate the axis of the division between the "one-half" of minerals and limestone owned by Carmeuse and those owned by Helms is the median line between the two strike lines.

(JA 705-706).

However, the "Half-the-Veins" Paragraph does not mention any of this procedure and Helms has provided no evidence that the parties to the 1992 James River Deed even contemplated such a procedure. To the contrary, Appellants' expert rejected the possibility of such a procedure, as does the chain of title. (JA 1306-1307). The "Half-the-Veins" Paragraph was first used in 1917, long before the availability of the "geological drilling" Helms claims is required to apply it.

56

Nevertheless, the District Court granted Helms summary judgment on this issue, although it did not require the "Mapping the Strike Lines" Procedure suggested by Helms. (JA 1771). Instead, the District Court found that the "Half-the-Veins" Paragraph was unambiguous, and ordered that the Mineral Estate be divided according to that paragraph. According to the District Court:

> Carmeuse owns "half the veins of limestone" and Helms owns the other half…. Carmeuse's half is to be "measured along the veins of limestone from the division line of [the 306-acre tract referenced in the 1992 James River Deed] in a southwesterly direction."

(JA 1771).

The District Court did not provide any guidance on how to interpret the "Half-the-Veins" Paragraph other than a footnote stating that a "geological survey" would "likely will be necessary."

After this Order was entered, Helms filed a Motion to Amend Order (JA 1777). The District Court denied the Motion to Amend, but then contradicted its earlier ruling, stating:

> It was the court's intent to divide the limestone "on a 200 acre tract of land belonging to G.W. Webster, and adjoining the said 306 acre tract" conveyed earlier in the 1992 James River Deed, as instructed by the 1992 Deeds, and **not** to divide the stone rights on the Thomas property in half.

(JA 1797) (emphasis added).

These rulings by the District Court are incorrect, inconsistent and themselves ambiguous. By itself, the "Half-the-Veins" Paragraph is ambiguous and must be

57

interpreted in favor of Carmeuse. When the entire chain of title is considered, there can be no dispute that Carmeuse owns the entire Mineral Estate except for the 300 Foot Strip and Helms owns the Mineral Estate on the 300 Foot Strip.

### A. The "Half the Veins" Paragraph from the 1992 James River Deed is ambiguous.

Virginia courts have defined ambiguity as the "condition of admitting of two or more meanings, of being understood in more than one way." CNX Gas Co., 752 S.E.2d at 867. When there is an ambiguity in fitting the description to the land, "it is the duty of the court to ascertain the intention of the parties as gathered from the description *as applied to the land* itself in the light of circumstances surrounding the parties at the time of the conveyance . . ." Smith, 141 Va. at 771. The Supreme Court of Virginia has noted that "a description, though indefinite, is sufficient, if the court can, with the aid of extrinsic evidence which does not add to, enlarge, or in any way change the description, fit it to the property conveyed by the deed. It is necessary, however, that the description be such that it can be rendered certain by such evidence." Sharp v. Shenandoah Furnace Co., 100 Va. 27, 40 S.E. 103, 106 (1901)(internal citations omitted).

The "Half the Veins" Paragraph in the 1992 James River Deed is ambiguous because the language can be understood in more than one way and fitting it to the ground does not render it certain.

1.    *The "Half-the-Veins" Paragraph can be understood in more than one way.*

Even before it is applied to the ground, the "Half-the-Veins" Paragraph has multiple possible meanings, beginning with the phrase "half-the-veins."  This phrase could refer to one-half of the total number of limestone formations on the Property or one-half of each formation or one-half of all the formations.  While Helms claims that this phrase only refers to two of the four limestone formations on the Property, he admits that the term "veins" in the 1901 Deed refers to all the stone on the Property.

The "Half-the-Veins" Paragraph is not clarified by its measurement language, which simply states that the "half [is] to be measured along the veins of limestone from the division line of the 306 acre tract in a southwesterly direction." (JA 478-479).  The phrase "measured along" is not defined and could mean any number of different measurement techniques, different directions, different starting locations, and different ending locations.   The "Half-the-Veins" Paragraph provides no further guidance on how to divide the Mineral Estate.  Accordingly, it can be understood in more than one way and is ambiguous.

2.    *The "Half the Veins" Paragraph cannot be fit to the land.*

The ambiguities increase once Helms attempts to fit "Half-the-Veins" Paragraph to the land.

i.      The location of the Veins cannot be determined without digging them up.

The "Half-the-Veins Paragraph refers to multiple limestone "veins" – presumably, formations – and requires that they be "measured along." (JA 478-479). Mr. Hans Naumann, an expert geologist, testified that there are probably four formations of limestone on the Property. These formations are not uniform in size, width or depth and, except for random outcroppings, are not visible on the surface. Mr. Naumann specifically rejected any plan to measure these formations on the surface:

> [The] plan to 'plat' the extent of the grey beds of limestone would be an inaccurate representation of their true distribution. As the beds are not flat lying, their extent extends below the surface of the earth, and a depiction of the beds' outcrops **does not accurately quantify the amount of limestone** contained within the Thomas property.

(JA 507).

Accordingly, "measuring along" the formations from the surface is impossible. To truly "measure" the formations, they must be excavated, a process that was clearly not intended by the parties to the 1992 Deeds.

ii.     The "Half-the Veins" Paragraph provides no starting or ending location for its measurement.

The "Half the Veins" Paragraph states that the measurement along the veins begins at the "division line of the 306 acre tract." The 306 acre tract probably refers to the Rocky Point Tract owned by Carmeuse, but that tract has no division

line.  Helms claims the "division line of the 306 acre tract" actually means the boundary between the 306 acre tract and the Property.  But, even if that is true, the "Half-the-Veins" Paragraph gives no guidance as to where to start along that boundary.



Similarly, the "Half-the-Veins" Paragraph does not identify any ending point for its measurement along the veins.  To further complicate matters, the limestone formations underlie the entire Property.  Thus, this measurement could be made from any point along the north-eastern border of the Property to any point on the southwestern border of the Property and still be, literally, "along the veins."

Accordingly, the "Half-the-Veins" Paragraph is rendered uncertain once it is applied to the land.

### 3. *The "Half-the-Veins" Paragraph was unable to be applied by an expert surveyor.*

Mr. McMurry is an expert surveyor who not only walked the Property, but also reviewed the chain of title. (JA 407). Afterwards, he opined that "the language in the 'Half the Veins' Paragraph . . . was not chosen carefully . . ." and did not "reflect an intent to redraw the division line of the [Mineral Estate] as set by the Chancery Court." (JA 739). Mr. McMurry explained that a surveyor could not determine the location of the limestone formation under the Property by walking over its surface. (JA 1315). In other words, no surveyor could "measure along" the formations or veins as required by the "Half-the-Veins" Paragraph.

### 4. *The "Half-the-Veins" Paragraph was unable to be applied by an expert geologist.*

As stated above, Appellants' expert geologist, Dr. Watts, was asked during his deposition how to conduct the measurement process suggested by Helms based on the "Half-the-Veins" Paragraph. He responded: "based on what you just described, I would have a thousand questions before I would know what to look for or what to expect." (JA 1317-1318).

5.    *The District Court did not resolve the ambiguity of the "Half-the-Veins" Paragraph by suggesting a "geological survey" would be "necessary."*

After finding that the "Half-the-Veins" Paragraph was unambiguous, the District Court was forced to admit that "[a]t the time either owner intends to begin quarrying, it likely will be <u>necessary</u> for a geological survey to be performed <u>to determine the precise location of the actual dividing line between the two halves</u>." (JA 1771) (emphasis added).

This suggestion by the District Court has no basis in the law and leaves the parties with more questions than answers. The "Half-the-Veins" Paragraph makes no reference to such a survey and there is no evidence that such a survey was contemplated in 1992 or previously since 1917. Furthermore, the District Court fails to cite any evidence that a geological survey will actually "determine the precise location" of the division of the Mineral Estate. (JA 1771). As discussed above, Dr. Watts suggested that he would have "1,000 questions" before beginning such a division. (JA 1317-1318). The District Court failed to answer any of these, leaving the parties without any guidance as to how to divide the Mineral Estate.

**B.    The surrounding circumstances establish Carmeuse owns the entire Mineral Estate, except the 300 Foot Strip.**

The "Half the Veins" Paragraph is ambiguous. Under Virginia law, ambiguous deeds are to be interpreted according to their surrounding circumstances and specifically the chain of title. See <u>CNX Gas Co.</u>, 752 S.E.2d at

867; Davis v. Seybold, 195 F. 402, 412 (4th Cir. 1912). When the "Half-the-Veins" Paragraph is considered as part of the 1992 James River Deed, the surrounding circumstances, and the chain of title, what the parties intended is clear. Carmeuse received the entire Mineral Estate, except for the 300 Foot Strip and Helms received the Mineral Estate on the 300 Foot Strip.

> ### 1. *The chain of title establishes that Carmeuse owns the entire Mineral Estate, except the 300 Foot Strip.*

> #### i. The 300 Foot Line has been maintained throughout the chain of title since it was created in 1900.

As set forth in the Statement of the Case, the Chancery Court divided the Mineral Estate between Parcel No. 1 and Parcel No. 2 based on the 300 Foot Line. Parcel No. 1 was conveyed by the 1902 Deed and included various fee simple parcels collectively referred to as the "Indian Rock Quarry." (JA 410-412). Parcel No. 2 was conveyed by the 1901 Deed and included various fee simple parcels collectively referred to as the "Rocky Point Quarry." (JA 410-414).

This division has been maintained and referenced repeatedly by subsequent owners of the Mineral Estate. Parcel No. 2 was leased in 1917, 1925, and 1953, and then sold in the 1992 James River Deed. (JA 414-416). In the 1925 and 1953 Leases, both Parcel No. 2 and the 1901 Deed are used to define the property being leased. (JA 414-416, 456, 465) In the 1992 James River Deed, the 1901 Deed (which conveyed Parcel No. 2) is used in the derivative clause. (JA 478).

Parcel No 1. was never leased, but was sold to Helms in the 1992 Helms Deed, which stated that Helms was receiving "the same property . . . earlier conveyed in Deed Book 'H', Page 375 [the 1902 Deed conveying Parcel No. 1]" (JA 481-482).

These references in the chain of title confirm that the parties to the 1992 Deeds intended to convey Parcel No. 2 (which includes all the Stone and Quarrying Rights, except for the 300 Foot Strip) to Carmeuse's predecessor and Parcel No. 1 (the 300 Foot Strip) to Helms. (JA 729).

ii.    The leases in the chain of title confirm that the "Half-the-Veins" Paragraph refers to entire Mineral Estate except for the 300 Foot Strip.

As mentioned above, Parcel No. 2 was leased to Carmeuse's predecessor from 1917 to 1992 before the parent company of that predecessor purchased it in 1992. Thus, these leases were between the same parties as the 1992 James River Deed.

These leases confirm that Carmeuse owns Parcel No. 2. The 1917 Lease features the original use of the "Half the Veins" Paragraph. As Mr. McMurry (Carmeuse's expert surveyor) noted, this original "Half the Veins" Paragraph has numerous errors and was clearly not drafted carefully. (JA 415, 739). Thus, according to Mr. McMurry, the "Half-the-Veins" Paragraph does not reflect an intent to redraw the division line of the Mineral Estate set by the Chancery Court.

Id.  Instead, it was most likely an assumption that the Mineral Estate was, like the fee simple properties, originally divided roughly in half.  Id.  Clearly, the original "Half-the-Veins" Paragraph was not intended to require a modern 2015 "geological survey."

In addition, both the 1925 Lease and the 1953 Lease define the "Half-the-Veins" Paragraph as Parcel No. 2 (all of the Mineral Estate except for the 300 Foot Strip).   Similar to the 1917 Lease, each of these leases state that the property being leased is both the fee simple parcels in Parcel No. 2 (the "306 acre tract") and the "Half-the-Veins" Paragraph ("200 acres adjoining").  (JA 457, 466).  Immediately following that paragraph, each Lease states:

> The said 306 acre tract and the stone rights on the 200 acres adjoining, mentioned in this lease is the tract [Parcel] No. 2 conveyed [in the 1901 Deed].
>
> (JA 457, 466).

Thus, the "Half-the-Veins" Paragraph was defined as being Parcel No. 2 by the parties to the 1992 James River Deed.[16]

---

[16] Clifford Wells was the CEO of James River Limestone, the owner of grantee in the leases and the grantee in the 1992 James River Deed.  Mr. Wells stated under oath in 1996 that the 1992 James River Deed was intended convey the same property leased in the 1953 Lease.  (JA 738).

2. *Helms' own testimony confirms that Carmeuse owns the entire Mineral Estate except the 300 Foot Strip.*

Helms himself admitted that Carmeuse owns the entire Mineral Estate, except for the 300 Foot Strip.[17]   At his deposition on August 21, 2014, Helms stated that his understanding when the 1992 Deeds were executed was that he was only receiving the mineral rights south of the Property.  (JA 1525-1527).   The admission of an owner of a property is evidence of that property's boundary.  See, e.g., Pilkerton v. Roberson, 65 S.E. 835, 836 (Va. 1909).   Furthermore, a party cannot rise above his own factual statements.  Travis v. Bulifant, 226 Va. 1, 5 (1983).

**C.     The rules of deed interpretation confirm that Carmeuse owns the entire Mineral Estate, except for the 300 Foot Strip.**

1. *The ambiguous "Half-the-Veins" Paragraph must be interpreted in favor of Carmeuse.*

Carmeuse's predecessor was the grantee in the 1992 James River Deed, which included the ambiguous "Half-the-Veins" Paragraph.   According to well-settled rules of deed interpretation, an ambiguous deed "must be construed against the grantor and in favor of the grantee," and the grantor "must be considered to have intended to convey all that the language he has employed is capable" of conveying.  CNX Gas Co., 752 S.E.2d at 867.

---

[17] The District Court acknowledged Helms' testimony, but rejected it based on its finding that the "Half-the-Veins" Paragraph was unambiguous.  (JA 1771).

2.  *The ambiguous "Half-the-Veins" Paragraph must be harmonized with all parts of the 1992 Deeds, including the references to the 300 Foot Line.*

Virginia law requires a court interpreting an ambiguous deed to harmonize all parts of the deed together to determine the parties' intent.  Id. at 867.  In this case, the ambiguous "Half the Veins" Paragraph must be harmonized with the earlier derivative clause, which references the 1901 Deed which included all of the Mineral Estate, except for the 300 Foot Strip.[18] The only logical way to harmonize these clauses is to find that the "Half-the-Veins" Paragraph refers to Parcel No. 2, as the parties to the 1992 James River Deed themselves previously stated.

3.  *The ambiguous "Half-the-Veins" Paragraph must be fit to the land which only can be done with the 300 Foot Line.*

Deeds must be fit to the land.  Smith, 141 Va. at 768.  The "Half-the-Veins" Paragraph by itself cannot be fit to the land, according to Mr. McMurry and Dr. Watts.  (JA 1315, 1317-1318).  By contrast, the 300 Foot Line can be easily fit to the land.

To put it another way, the 300 Foot Line has not only been used consistently in the chain of title, it is the only division that can be fit to the land.

---

[18] Helms tried to argue that the derivative clauses were part of "separate conveyances," but this argument is contrary to the clear terms of the 1992 Deeds because there is only one granting clause – and only one conveyance – in each Deed.  (JA 1514).

## CONCLUSION

For the foregoing reasons, Carmeuse and Helms respectfully request that this Honorable Court affirm the District Court's decision that (a) the Yard Restriction is unenforceable, (b) Carmeuse and Helms own the entire Mineral Estate conveyed by the 1849 Deed, and (c) the owners of the Mineral Estate may use modern quarrying techniques on the Property. Carmeuse respectfully requests that this Honorable Court reverse the inconsistent decisions of the District Court that Helms owns half and more than half of the Mineral Estate and determine that Carmeuse owns the entire Mineral Estate, except for that on the 300 Foot Strip.[19] Carmeuse also respectfully requests that this Honorable Court award it its costs.

---

[19] Helms does not join in this portion of the Conclusion.

## STATEMENT REGARDING ORAL ARGUMENT

Carmeuse and Helms respectfully request oral argument in this matter because this case presents important issues concerning deed interpretation and the rights of holders of mineral estates, as well as a District Court's duty to clearly determine the parties' rights in a declaratory judgment action. Carmeuse and Helms welcome the opportunity to address the Court's questions.

/s/ Thomas Moore Lawson
Thomas Moore Lawson
Joshua E. Hummer
LAWSON AND SILEK, P.L.C
P.O. Box 2740
Winchester, VA  22604
(540) 665-0050

*Counsel for Appellees/Cross-Appellants*
  *Carmeuse Lime & Stone, Inc.*
  *and O-N Minerals (Chemstone) Company*

/s/ Robert C. Hagan, Jr.
Robert C. Hagan, Jr.
ATTORNEY AT LAW
P.O. Box 448
26 E. Main Street
Fincastle, VA  24090
(540) 473-2044

*Counsel for Intervenor/Appellee*
  *Thomas M. Helms, Sr.*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>16,439</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


Dated:  August 31, 2015          <u>/s/ Thomas Moore Lawson</u>
                                 Thomas Moore Lawson

                                 *Counsel for Appellees/Cross-Appellants*
                                   *Carmeuse Lime & Stone, Inc.*
                                   *and O-N Minerals (Chemstone) Company*


                                 <u>/s/ Robert C. Hagan, Jr.</u>
                                 Robert C. Hagan, Jr.

                                 *Counsel for Intervenor/Appellee*
                                   *Thomas M. Helms, Sr.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 31, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
206 East Cary Street
P.O. Box 1460 (23218)
Richmond, VA 23219
(804) 249-7770