RECORD NO. 15-1446(L)
CROSS-APPEAL NO. 15-1447

IN THE

# United States Court of Appeals
### FOR THE FOURTH CIRCUIT

JUSTIN D. THOMAS; IRENE S. THOMAS,

*Plaintiffs - Appellants,*

v.

CARMEUSE LIME & STONE, INCORPORATED;
O-N MINERALS (CHEMSTONE) COMPANY,

*Defendants - Appellees,*

v.

THOMAS M. HELMS, SR.,

*Intervenor/Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

### RESPONSE/REPLY BRIEF OF APPELLANTS

J. Scott Sexton
Scott Andrew Stephenson
GENTRY LOCKE
Suite 900
10 Franklin Road, SE
Roanoke, Virginia 24011
(540) 983-9300
sexton@gentrylocke.com
stephenson@gentrylocke.com

*Counsel for Appellants*

# Table of Contents

Table of Authorities ........................................................................ iii

Introduction .................................................................................... 1

I.  The Yard Clause Must Be Upheld .............................................. 2

II. Defendants Cannot Take the Entire Surface of the Property –
    An Estate They Did Not Purchase ............................................. 3

III.The Chancery Deeds Plainly Convey the Limestone Estate ..................... 4

Statement of the Case ....................................................................... 5

Law and Argument ........................................................................... 5

I.  The Court Must Honor The Yard Clause ................................... 5

    A. The Yard Clause Plainly Prohibits Blasting, Quarrying, or Taking
       Away Stone in the Yard ...................................................... 5

    B. Even Under Defendants' Erroneous Standard, the Yard Clause
       is Valid ................................................................................ 10

       1.  There is No Irreconcilable Conflict in the 1849 Deed ................. 10

       2.  The 1849 Deed Can be Harmonized as a Whole .......................... 12

    C. Defendants' Occupancy Gloss on the Yard Clause Contravenes
       Virginia Law ...................................................................... 13

       1.  Defendants' Reasoning Produces an Absurd Result .................... 14

       2.  Zoning is Irrelevant ........................................................ 16

    D. Virginia Law Requires that this Court Reverse the District
       Court's Judgment .............................................................. 16

i

1. CNX Gas Co. LLC v. Rasnake................................................... 16

2. Bradley v. Virginia Ry. And Power Co........................................ 17

3. Yukon Pocahontas Coal Co. v. Ratliff ....................................... 17

4. Summary...................................................................... 18

E. The Doctrine of Changed Circumstances is Irrelevant ..................... 18

II. Defendants Cannot Take and Destroy Thomas's Estate ........................ 20

A. Reynolds and Wilson Did Not Contemplate the Complete
Destruction of the Property.................................................. 21

B. Advancements Do  Not Permit the Defendants to Enlarge the
Estate Granted by the 1849 Deed ............................................ 23

III. The Chancery Deeds Conveyed the Limestone..................................... 24

A. "Limestone" Does Not Mean "All Stone"...................................... 24

B. Read Together, the Chancery Deeds Demonstrate a Clear Intent...... 27

1. The Chancery Deeds and the Chancery Documents Plainly
Demonstrate that the "Grey Limestone" was Conveyed.............. 27

2. The E. Dillon Line Locates the Limestone Conveyed ................. 29

C. The Court Must Effectuate the Plain Meaning of the
Chancery Deeds .................................................................. 30

Conclusion ........................................................................ 30

Certificate of Compliance with Rule 28.1(e)(2)(B)(i) and Local
Rule 32(b)........................................................................ 32

Certificate of Service ........................................................... 33

# Table of Authorities

## Cases

*Amos v. Coffey,*
320 S.E.2d 335 (Va. 1984)...................................................................5-6, 25

*Arbern Realty Co. v. Swicegood,*
109 S.E.2d 108 (Va. 1959)........................................................................ 9

*Bailey v. Town of Saltville,*
691 S.E.2d 491 (Va. 2010).......................................................................... 6

*Benn v. Hatcher,*
81 VA. 25 (1885) ................................................................................. 6, 11

*Beury v. Shelton,*
144 S.E. 629 (Va. 1928)........................................................................ 22, 23

*Bradley v. Virginia Ry. And Power Co.,*
87 S.E. 721 (Va. 1916)........................................................... 11, 12, 17, 18

*Butcher v. Creel's Heirs,*
50 VA. 201 (1852) ................................................................................ 10

*Camp v. Camp,*
260 S.E.2d 243 (Va. 1979)........................................................................ 18

*Cheatham v. Taylor,*
138 S.E. 545 (Va. 1927).......................................................................... 19

*Chesapeake Corp. of Virginia v. McCreery,,*
216 S.E.2d 22 (Va. 1975)...................................................................... 7, 8

*Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith,*
568 S.E.2d 676 (Va. 2002)........................................................................ 19

*Clayborn v. Camilla Red Ash Coal Co.,*
105 S.E. 117 (Va. 1920)......................................................................... 24

*CNX Gas Co. LLC v. Rasnake,*
752 S.E.2d 865 (Va. 2014)......................................................................passim

*Conner v. Hendrix,*
72 S.E.2d 259 (Va. 1952)................................................................. 6

*Durham v. Pool Equipment Company,*
138 S.E.2d 55 (Va. 1964)................................................................. 6

*Ellis v. Comm'r of Dep't of Mental Hygiene and Hospitals,*
142 S.E.2d 531 (Va. 1965)......................................................... 20, 23

*Goodson v. Capehart,*
349 S.E.2d 130 (Va. 1986)......................................................... 10, 11

*Halsey v. Fulton,*
89 S.E. 912 (Va. 1916)................................................................. 29

*Horvath v. Bank of N.Y., N.A.,*
641 F.3d 617 (4th Cir. 2011) ....................................................... 15

*James River Hydrate Supply Co. v. United States,*
337 F.2d 277 (4th Cir. 1964) ....................................................... 25

*James River Kanawha Co. v. Old Dominion Iron & Steel Corp.,*
122 S.E. 344 (Va. 1924)............................................................... 27

*Jernigan v. Capps,*
45 S.E.2d 886 (Va. 1948)............................................................. 19

*Layne v. Henderson,*
351 S.E.2d 18 (Va. 1986)............................................................. 15

*Magann Corp. v. Electric Works,*
123 S.E.2d 377 (Va. 1962)........................................................... 6

*Matney v. Cedar Land Farms, Inc.,*
224 S.E.2d 162 (Va. 1976)........................................................... 7

*Midkiff v. Glass,*
123 S.E. 329 (Va. 1924) ............................................................... 7

*Mullins v. Beatrice Pocahontas Co.,*
432 F.2d 314 (4th Cir. 1970) ...................................................... 24

*Nat'l Lime & Stone Co. v. United States,*
384 F.2d 381 (6th Cir. 1967) ...................................................... 25

*Oakwood Smokeless Coal Corp. v. Meadows,*
34 S.E.2d 392 (Va. 1945) ............................................................ 24

*Oliver Refining Co. v. Portsmouth Cotton Oil Refining Corp.,*
64 S.E. 56 (Va. 1909) .................................................................. 27

*Phipps v. Leftwich,*
222 S.E.2d 536 (Va. 1976) ............................................... 20, 21, 24

*Priority Auto Grp., Inc. v. Ford Motor Co.,*
757 F.3d 137 (4th Cir. 2014) ........................................................ 1

*Scott v. Walker,*
645 S.E.2d 278 (Va. 2007) .......................................................... 19

*Shenandoah Land & Anthracite Coal Co. v. Clarke,*
55 S.E. 561 (Va. 1906) ................................................................ 16

*Stonegap Colliery Co. v. Hamilton,*
89 S.E. 305 (Va. 1916) ........................................................... 21, 24

*Traylor v. Holloway,*
142 S.E.2d 521 (Va. 1965) .......................................................... 20

*Wolverton v. Hoffman,*
52 S.E. 176 (Va. 1905) ................................................................ 12

*Wornam v. Hampton Normal and Agric. Institute,*
132 S.E. 344 (Va. 1926) .............................................................. 12

*Yukon Pocahontas Coal Co. v. Ratliff,*
24 S.E.2d 559 (Va. 1943).......................................................................passim

## INTRODUCTION

The district court held that Defendants[1] could take and destroy Thomas's estate, despite the contrary unequivocal intention of the parties' predecessors in interest. This unprecedented holding finds no support in Virginia law, and Defendants offer none on appeal. For good reason: under the foundational rule adopted by the court below, any limiting clause in a deed may be held void --- regardless of the parties' intentions.

The impact of this ruling is profound. It authorizes Defendants to destroy Thomas's entire estate (including his rare and historic 18th century home), and effectively grants them a fee-simple interest in the Property – an estate which neither Defendant purchased.

When Defendants attempt to defend their windfall recovery, their efforts fall flat in the face of bedrock Virginia law. So, they misstate applicable Virginia law and rely on case law from other jurisdictions. This Court must "apply[] the law of Virginia as it would be applied by the Supreme Court of Virginia if the case were before that court." *Priority Auto Grp., Inc., v. Ford Motor Co.,* 757 F.3d 137, 139 (4th Cir. 2014). Here, a straightforward application of Virginia property law requires that the Court reverse the district court's decision.

---

[1] Referenced separately as "Carmeuse" and "Helms."

1

## I.    *The Yard Clause Must Be Upheld.*

The 1849 Deed demonstrates a clear intent: Reynolds made two distinct conveyances – a fee tract of 127 acres and a stone-only interest in the adjoining 200 acres that he used as his plantation for farming and lime production. Reynolds and Wilson limited the stone-only grant by several clear clauses, including the Yard Clause. The Yard Clause clearly prohibits Wilson from quarrying – or even removing – any stone within the "Yard." Virginia law required the district court to honor this plain intent.

Whether the Yard Clause is dubbed a reservation, prohibition, or exception is irrelevant --- particularly where, as here, the parties' intent is plain. There is no ambiguity in the 1849 Deed. The district court erred in disregarding this plain intent simply because it did not know what to call it.

Even under the district court's flawed legal standard, the Yard Clause must be upheld. Well-established principles required the district court to construe the 1849 Deed as a whole to effectuate all of its parts. The clauses in the 1849 Deed are easily harmonized. The Yard Clause is not "repugnant" to the deed's grant. No Virginia case supports the district court's decision to void the Yard Clause. The ruling was pure error.

Defendants' try to avoid this obvious result, by throwing in everything but the kitchen sink. There is no question in this appeal as to whether the historic

2

house on the Thomas property is, in fact, the Reynolds' house from the 1849 Deed. The court below assumed it was for purposes of the summary judgment ruling. Yet, Defendants avoid the real issues of deed interpretation by casting questions as to the location of the "Yard" --- which plainly surrounds the house. And, Defendants' expert admitted that it was at least "fifty to seventy feet or so in every direction from the dwelling house …." (JA 1367). As Judge Turk firmly held, the Yard Clause is not dependent on occupancy. And, it is not a restrictive covenant, so the "doctrine" of changed circumstances does not apply. The plain intent of the parties governs. The district court's decision must be reversed.

## II.    *Defendants Cannot Take the Entire Surface of the Property – An Estate They Did Not Purchase.*

Defendants misstate the fundamental issue here. The question is not whether the parties to the 1849 Deed contemplated quarrying. The question is whether they contemplated destruction of the historic stone house and the entire surface.

The district court agreed that Reynolds and Wilson contemplated nothing of the kind. And, Defendants acknowledged that "quarrying" in 1849 – long before the industrial revolution – was primitive. Advances in limestone quarrying between 1849 and now have profoundly changed the scale of industrial practice. Comparing the destructive effect between then and now is like comparing a firecracker to a nuclear missile.

3

The language in the 1849 Deed demonstrates the obvious extent of these advancements. Reynolds and Wilson expected any quarrying on the Property to coexist with residency and farming. Under Carmeuse's plans, it is plain that they cannot.

Virginia law does not permit Defendants to use technological advancements to enlarge their estate. Defendants did not purchase the surface; Thomas did. Defendants cannot take what they do not own.

### III.    *The Chancery Deeds Plainly Convey the Limestone Estate.*

The clear language of the Chancery Deeds (reinforced by the chancery documents) confirms that the 1901 and 1902 Deeds plainly conveyed "limestone" located along a rich vein of grey limestone on the southwest portion of the Property. Virginia law requires that the Chancery Deeds be read together to effectuate their intent.

Searching for a larger estate than the deeds provide, Defendants discard the plain language in the deeds (e.g., "along the grey vein," "the E. Dillon line," etc.). They then argue that the rule of "construction against the grantor" requires that these words be overlooked. Such an approach flouts Virginia law.

More to the point, the *limestone* was the only valuable stone on the Property. Defendants lump all the stone on the Property into one category, but their

efforts are belied by the undisputed evidence – including their own expert opinions. These facts confirm the intent of the Chancery Deeds.

## STATEMENT OF THE CASE

Thomas incorporates the Statement of the Case from the Opening Brief. (*See* Br. at 4-26). With respect to the facts related to Carmeuse's cross-appeal, Thomas adopts the factual recitation of the district court, and agrees with the district court's rulings (only) on the issues presented by Carmeuse's cross-appeal. (*See* JA 1766-71).

## LAW AND ARGUMENT

Defendants correctly observe that "[t]he prime consideration, as with any writing, is to determine the intention of the parties executing the instrument." (Opp. Br. at 21). They also agree that a court must consider a deed as a whole and harmonize its terms. (Opp. Br. at 23). They agree that the threshold inquiry is "whether or not a deed is ambiguous." (Opp. Br. at 21). Defendants then ignore these principles entirely.

## I.     THE COURT MUST HONOR THE YARD CLAUSE.

### A. The Yard Clause Plainly Prohibits Blasting, Quarrying, or Taking Away Stone in the Yard.

Virginia adheres to the plain meaning rule. "[W]hen parties set out the terms of their agreement in a clear and explicit writing then such writing is the sole memorial of the contract and . . . the sole evidence of the agreement." *Amos v.*

*Coffey,* 320 S.E.2d 335, 337 (Va. 1984) (quoting *Durham v. Pool Equip. Co.,* 138 S.E.2d 55, 59 (Va. 1964)). "[I]t is not permissible to interpret that which has no need of interpretation." *Bailey v. Town of Saltville,* 691 S.E.2d 491, 494 (Va. 2010) (citing *Conner v. Hendrix,* 72 S.E.2d 259, 265 (Va. 1952)). Where a grantor plainly seeks to limit a grant within a deed, Virginia courts effectuate this intent. *Yukon Pocahontas Coal Co. v. Ratliff,* 24 S.E.2d 559 (Va. 1943); *Benn v. Hatcher,* 81 Va. 25, 30 (1885).

The Yard Clause plainly prohibits quarrying within the Yard:

> And it is also agreed and understood between the parties that the ***said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the inclosure of the yard attached to the said Reynolds' present dwelling house***; this provision being inserted to protect the family of said Reynolds, and of his heirs and assigns, or other persons who may be in occupancy of the house, from annoyance.

(JA 240, 245 (emphasis added)).

Wilson and Reynolds clearly agreed to prohibit quarrying under and around the house on the Property. The language can only be read to that effect. The analysis ends there. *See Amos,* 320 S.E.2d at 337 (quoting *Magann Corp. v. Electric Works,* 123 S.E.2d 377, 381 (Va. 1962)) (the court is "bound to say that the parties intended what the written instrument plainly declares").

Defendants begin by contending that the Yard Clause is void as repugnant, without explaining what makes the clause unclear. This backwards approach is

6

contrary to Virginia law. The repugnancy rule (or any other rule of construction) can only apply where it is first "impossible to discover with reasonable certainty the parties' intent from the language of the deed . . ." *CNX Gas Co. LLC v. Rasnake,* 752 S.E.2d 865, 868 (Va. 2014).

Defendants later suggest two sources of ambiguity in the 1849 Deed: (1) the location of the Yard; and (2) what to call the Yard Clause. (Opp. Br. at 27-29). Neither holds water.

*First*, a deed description is sufficient as long as it identifies the property conveyed with "*reasonable certainty.*" *Chesapeake Corp. of Virginia v. McCreery,* 216 S.E.2d 22, 25 (Va. 1975) (emphasis added). Thus, "[a] deed description is sufficient if it is possible, by any reasonable rules of construction to ascertain from the description, aided by extrinsic evidence, what the property is intended to convey." *Matney v. Cedar Land Farms, Inc.,* 224 S.E.2d 162, 164-65 (Va. 1976) (quoting *Midkiff v. Glass,* 123 S.E. 329, 331 (Va. 1924)).

In *McCreery*, the Supreme Court upheld a 5-acre exception that was "clearly erroneous on its face" as to multiple boundaries. 216 S.E.2d at 24. In the court below, a surveyor had testified that, based on his observations and the deed's language, he was reasonably certain of the boundaries' proper location. *Id.* at 26. The Court found this sufficient and honored the exception. *Id.*

7

*McCreery* echoes a hundred years of established Virginia law. In the 1885 *Benn v. Hatcher* case, the Supreme Court upheld a clause in a deed where the grantor had reserved "three-fourths of an acre as a burying-ground" without any other description. 81 Va. at 28. The grantee argued the deed was void for uncertainty. *Id.* The Court rejected this contention, and held that the parties had identified the burial plot long before the conveyance. *Id.* at 29. Even though the tract had become overgrown with trees and bushes, the boundaries were ascertainable. *Id.*

Defendants cherry-pick various excerpts from expert testimony to argue that the location of the house and yard are not reasonably certain. This is irrelevant under the Virginia legal standard. And, none of the experts stated that the Yard could not be located with reasonable certainty. Rather, each stated that the "exact" or "precise" location was unknown. (*See* JA 1367; 585, 587-88; Opp. Br. at 27).[2]

The description of the Yard in the 1849 Deed is reasonably certain --- and the house still stands. Reynolds and Wilson did not have to provide an exact metes and bounds description. It is not required under Virginia law. Reynolds and Wilson knew where the house and yard were. Everyone knows where the house is today. Even if the Defendants contest this plain fact --- it is then, by definition, a disputed

---

[2] Defendants also improperly suggest that the location of Reynolds's house is not certain. Opp. Br. at 28. This issue was irrelevant to the district court's summary judgment decision. *See* JA 1758 (assuming that Thomas's historic home is the house in the Yard Clause). Accordingly, that issue is not before this Court.

fact that requires a trial. For purposes of this court's analysis, everyone must accept that the present day house is the house from 1849.

As to the size of the yard, even if it is ultimately found to be only one inch surrounding the house, then the house cannot be destroyed. Here, the district court threw the baby out with the bathwater by authorizing the destruction of the house because the exact dimensions of the yard surrounding it are disputed. However, contrary to Defendants' assertion, the court below did not find the description of the yard ambiguous. And, even if the exact boundaries of the yard are not immediately ascertainable, Thomas's expert opined that a present-day survey *could* determine the Yard's exact location. (JA 589-90).

*Second*, fretting over what to call the grantor's right to be unmolested by blasting, quarrying, and taking away stone within the Yard is a useless exercise. *See Ratliff,* 24 S.E.2d at 563 (disregarding the distinction between reservation and exception); *Arbern Realty Co. v. Swicegood,* 109 S.E.2d 108, 110-11 (Va. 1959) ("[w]hen the intent [of a deed] is apparent, and not repugnant to some rule of law, it must prevail over mere technical terms").

Regardless of what the Yard Clause is called, the practical effect is the same: quarrying (or removing stone by *any* method) is plainly prohibited under the house and Yard. (*See* JA 1118-19). The Yard Clause has a clear, singular purpose.

9

Accordingly, the Court must effectuate the clear intentions of the parties, as expressed in the 1849 Deed.

## B. Even Under Defendants' Erroneous Legal Standard, the Yard Clause is Valid.

### 1. There is No Irreconcilable Conflict in the 1849 Deed

Defendants discard the only two modern cases that actually state the repugnancy rule. *See Rasnake,* 752 S.E.2d 865; *Goodson v. Capehart,* 349 S.E.2d 130, 133 (Va. 1986). Instead, they cite the antebellum decision *Butcher v. Creel's Heirs,* 50 Va. 201, 203 (1852) – where the Supreme Court neither stated nor applied the rule of repugnancy.

*Butcher* occurred when West Virginia was still part of Virginia. At that time, Virginia law authorized the condemnation of land necessary to support a mill dam. 50 Va. at 202-03. The grantor owned a five-acre tract on the Little Kanawha River (where his mill complex was located). A one-acre tract on other side of the river was condemned to support the dam abutment, making it part of the property. *Id.* He then conveyed the tract, but attempted to reserve the right to build or erect a saw mill on the opposite side of the river on the condemned one acre. *Id.* at 202.

Questioning whether the grantor could even reserve or except a property interest in condemned land, the Court held the grantor's reservation void for

10

uncertainty, because it did not identify *any* part of the one acre tract as the site for the proposed mill. *Id.* at 203. The Court did not mention repugnancy.[3]

That problem does not exist here. Like the tract in *Hatcher*, the location of the house and the Yard was obvious to Wilson in 1849 – just like the location of the stone house is obvious today. And, the Yard's boundaries can be identified with reasonable certainty. Even Defendants' expert admitted that it was "fifty to seventy feet or so in every direction from the dwelling house …" (JA 1367).

Repugnancy requires: (1) ambiguous intent; and (2) an irreconcilable conflict.[4] *Rasnake,* 752 S.E.2d at 868; *Goodson,* 349 S.E.2d at 132-33. Neither requirement is met here. The 1849 Deed demonstrates a clear intent. (*See* p. 6, *supra*). And, there is no irreconcilable conflict.

An irreconcilable conflict exists where there is no possible way to harmonize the granting clause with another conflicting clause within a deed. In other words, the two clauses must be unavoidably contradictory. *See Goodson,* 349 S.E.2d at

---

[3] Defendants also incorrectly state that the Supreme Court recited the repugnancy rule in *Bradley v. Virginia Ry. and Power Co.,* 87 S.E. 721 (Va. 1916). *See* Opp. Br. at 29. Again, the Court there did not even mention the word "repugnancy," much less discuss an "irreconcilable conflict" between the clauses in the deed at issue. *See id.*

[4] Defendants suggest that repugnancy requires only a conflict between clauses. *See* Opp. Br. at 25-26. They are wrong. *See Goodson,* 349 S.E.2d at 132-33 (requiring an "irreconcilable conflict").

131-33 (applying repugnancy where the granting clause in a deed conveyed a fee simple estate while the deed's preamble conveyed a life estate).[5]

No such conflict exists here. Reynolds conveyed only stone on the Property, and the parties jointly agreed to prohibit quarrying on only a fraction of the tract. The parties did not prohibit Wilson's quarrying on the vast majority of the Property. The Yard Clause limited the conveyance, but did not negate it. Such reservations and exceptions are the prevailing practice in mineral deeds. The Virginia Supreme Court has upheld virtually identical clauses in previous cases. *See Bradley, infra,* pp. 17, 18; *Ratliff, infra,* p. 17-18. The fact that the grantee did not get unfettered rights to everything does not create an irreconcilable conflict.

### 2. *The 1849 Deed Can be Harmonized as a Whole*

"Where the meaning of language is not clear, or the deed is not artfully drawn, *the court should interpret its terms to harmonize them, if possible, so as to give effect to the intent of the parties.*" *Rasnake,* 752 S.E.2d at 867 (emphasis added).

The clauses in the 1849 Deed must be harmonized if possible. Defendants and the district court opted for destruction instead – disregarding the clear intent of the parties to prohibit quarrying under and around the house, and for Reynolds to

---

[5] The Supreme Court's earlier decisions in *Wornam v. Hampton Normal and Agric. Institute,* 132 S.E. 344 (Va. 1926) and *Wolverton v. Hoffman,* 52 S.E. 176 (Va. 1905) reiterate this principle. In both cases, one grant completely contradicted an earlier grant in the same instrument.

continue using the surface of the Property. (JA 1773). The court below erred in failing to honor this intent.

Without explanation, Defendants argue that harmonization would rewrite the deed. (*See* Opp. Br. at 29). Both the granting clause and the Yard Clause are valid and should be given effect.

### C. Defendants' Occupancy Gloss on the Yard Clause Contravenes Virginia Law.

In earlier opinions, the court below ruled that the Yard Clause prohibition was not conditioned upon occupancy, directly or indirectly. (JA 218). Defendants do not accept this, and --- in reality, neither did Judge Conrad below. Judge Conrad stated that he agreed with Judge Turk's prior ruling in this case, but he then did exactly the opposite. Under the Defendants' argument and the district court's opinion, the Yard Clause goes away when "occupancy" goes away. While wrong for many reasons, Defendants' argument cannot survive even a grammatical scrutiny. Punctuation in the explanatory section of the Yard Clause makes this clear.

The comma following the word "house" is important:



13

(JA 240). The district court's opinions and Defendants' Opposition Brief omit the comma following "house." But, it is plainly evident in the original text. The second part of the Yard Clause reads:

> this provision being inserted to protect the family of said Reynolds, and of his heirs and assigns, or other persons who may be in occupancy of the house, from annoyance.

(JA 240). The Yard Clause protects three classes of people "from annoyance": (1) Reynolds; (2) his heirs and assigns; and (3) other persons who may be in occupancy of the house. Under a plain grammatical analysis, the explanatory clause simply states that the purpose is to protect Reynolds assigns (i.e., Thomas) from annoyance. Here, Thomas is extremely annoyed by the prospect of Carmeuse destroying the historic stone house that is plainly protected under his deed.

### 1. *Defendants' Reasoning Produces an Absurd Result*

The undisputed facts of the case refute the district court's "occupancy" conclusions. Thomas "occupies" the historic house. He purchased the house and planned to make it his family's permanent home. He did significant work to the house, and intended to fully renovate the structure. Moreover, he has stayed there on a number of occasions, and frequently returns to the Property. (JA 835-37; 842; 858-60; 912-15; 940; 1737-38).

Defendants' emphasis on occupancy echoes the flawed reasoning of the district court. A home is not "unoccupied" or "abandoned" simply because its

14

owner is not physically in it all the time. Otherwise, property owners might leave home for the week and return to find it bulldozed to the ground. Judge Turk noted this absurd result earlier in the case:

> [u]nder Defendants' proffered interpretation, the rights of the owner of the mineral estate would vary depending on whether the owners of the surface estate were living in the house at any given point or not, which would . . . produce anomalous results and lead to uncertainty as to the rights of both parties.

(JA 219).

Defendants' argument also violates the Virginia Rule Against Perpetuities. Under Defendants' construction, Wilson's rights to quarry in and under the house and Yard did not vest until the late 1900s (at the earliest) – when Reynolds's successors failed to use the house as a primary residence. Under Defendants' view, Wilson's interest is void under Virginia law. *See Layne v. Henderson,* 351 S.E.2d 18, 21 (Va. 1986).[6]

Accordingly, this Court must reject Defendants' approach. *See Horvath v. Bank of N.Y., N.A.,* 641 F.3d 617, 624-25 (4th Cir. 2011) (rejecting the plaintiff's construction of a deed of trust because the interpretation produced an absurd

---

[6] Defendants attempt to skirt this issue by arguing that the Yard Clause "is in the nature of a contract right, not a vesting property interest . . ." Opp. Br. at 35. Defendants are not only wrong, (*See* p. 18, *infra*), but also completely contradict their earlier assertion that the Yard Clause is a "property right[]." Opp. Br. at 33. Defendants cannot have it both ways.

outcome); *Shenandoah Land & Anthracite Coal Co. v. Clarke,* 55 S.E. 561, 563 (Va. 1906) (rejecting a proffered deed construction as creating an illogical result).

### 2. Zoning is Irrelevant

The only relevance of zoning in this case is that, when Thomas sought to rezone the house portion of Property in 2003, Carmeuse's predecessor actively blocked his application. (JA 914; 1738). Now, Defendants attempt to capitalize on the un-occupancy condition they caused by arguing that Thomas cannot satisfy "occupancy" condition. Virginia courts prohibit such manipulation.[7]

### D. Virginia Law Requires that this Court Reverse the District Court's Judgment.

#### 1. CNX Gas Co. LLC v. Rasnake

The Supreme Court's decision in *Rasnake* – the cornerstone of the district court's ruling – requires reversal.

In *Rasnake*, the deed conveyed a 75 acre fee, but explained that previous conveyances of "coals or minerals" were excluded.[8] The court was required to interpret the limiting language to determine whether it was an outright mineral exclusion or simply and exclusion of minerals that had previously been conveyed. It did so by harmonizing the entire deed to mean that only previously conveyed minerals were excepted. Thus, "the same being" meant "that have been." The

---

[7] The prevention doctrine bars such a result. *See* Br. at 48.

[8] "This sale is not ment [sic] to convey any coals or minerals. The same being sold and deeded to other parties heretofore." 752 S.E.2d at 866.

16

*Rasnake* court honored all of the clauses within the deed. Applying the same rule here is easy and does not support the conclusion sought by Defendants.

The phrase "this provision being inserted to protect the family of said Reynolds, and of his heirs and assigns, or other persons who may be in occupancy of the house, from annoyance" explains that the Yard Clause prohibition is intended to protect Thomas – Reynolds's successor – "from annoyance." The destruction of his entire estate (including his house) through quarrying is, at minimum, an "annoyance."

### 2.  *Bradley v. Virginia Ry. and Power Co.*

Defendants parrot the district court's discussion of *Bradley.* And, like the district court, they all but ignore its holding. The Court in *Bradley* did not void the ambiguous clause at issue. It construed it and upheld it as a reservation of the right to use the quarter acre plot as a cemetery. *Bradley* does not support an argument to *void* the Yard Clause as the district court did.

### 3.  *Yukon Pocahontas Coal Co. v. Ratliff*

The Supreme Court similarly upheld express reservations in an old deed in *Ratliff*. There, the grantor had conveyed "[a]ll coal, oil, and gas" rights on a 702-acre tract to a coal company, but reserved two small tracts, and certain "overland privileges." 24 S.E.2d at 561. The Court rejected a coal company's later attempts to void the grantor's reservations, and held the clauses valid. *Id.* at 563. The

grantor "clearly" and expressly intended to limit the conveyance by reserving a portion of the 702-acre mineral grant. *Id.*

### 4. Summary

*Bradley*, *Rasnake* and *Ratliff* are just examples of many cases where the Supreme Court effectuated the intent of the parties --- expressed by the deed at issue. Any broad grant in a deed may be limited by express language in the instrument. The Supreme Court rarely renders such provisions void; and has expressly cautioned against taking such action where clauses conflict. *See Camp v. Camp.,* 260 S.E.2d 243, 245 (Va. 1979) (a court may only use the "first in deed" rule to void a clause in a deed "in the case of 'rigorous necessity' and when . . . two clauses are absolutely incapable of reconciliation").

Here, the stone severance in the 1849 Deed is subject to numerous express limitations. Virginia law requires that the Court give each of these clauses effect.

### E. The Doctrine of Changed Circumstances is Irrelevant.

Defendants proffer an alternative argument that they offered to the district court: "the doctrine of changed circumstances." (Opp. Br. at 37). The court below did not take the bait. This Court should also decline the invitation --- for at least three reasons.

*First*, the doctrine only applies to restrictive covenants. And the Yard Clause is not a restrictive covenant. A restrictive covenant regulates and limits a party's

18

use of real property --- property that the party either already owns or has a right to use/access. *See, e.g., Scott v. Walker,* 645 S.E.2d 278, 280 (Va. 2007); *Chesterfield Meadows Shopping Ctr. Assocs., L.P., v. Smith,* 568 S.E.2d 676, 677 (Va. 2002); *Jernigan v. Capps,* 45 S.E.2d 886, 888 (Va. 1948); *Cheatham v. Taylor,* 138 S.E. 545, 548 (Va. 1927).

The 1849 Deed granted no access rights to the stone within the Yard whatsoever. The Yard Clause did not simply regulate Wilson's access to the stone in the Yard. It outright prohibited Wilson and his assigns from removing *any* stone under the house and Yard. The clause is not a restrictive covenant.

*Second*, the rule only applies where the circumstances have "changed so radically as to destroy the essential objects and purposes" of the covenant. (Opp. Br. at 37). This has not occurred. As noted above, the singular purpose of the Yard Clause is to protect Reynolds, his successors, and others from the "annoyance" created by quarrying. The destruction of Thomas's home and the conversion of the immediately surrounding Property into a massive pit is easily an "annoyance" that the Yard Clause sought to prevent. The clause serves the same purpose now as it did 160 years ago.

*Third*, such an inquiry is unsuited for summary judgment because it is "inherently a fact specific analysis." *Chesterfield,* 568 S.E.2d at 680. That is

particularly true under the facts of this case where Carmeuse blocked Thomas'
efforts to zone the house so he could live in it.

## II.   DEFENDANTS CANNOT TAKE AND DESTROY THOMAS'S ESTATE.

"A deed must be construed as of the date and under the circumstances of its
execution." *Ellis v. Comm'r of Dep't of Mental Hygiene and Hospitals,* 142 S.E.2d
531, 536 (Va. 1965 ). The reason for this rule is simple: "the purpose or intent of a
written instrument must be determined from the language used in light of the
circumstances under which it was written." *Leftwich,* 222 S.E.2d at 539; *Ellis,* 142
S.E.2d at 536; *Traylor v. Holloway,* 142 S.E.2d 521, 523 (Va. 1965). No one
disputes that Reynolds and Wilson did not anticipate the destruction of the entire
surface when they executed the 1849 Deed. (*See* JA 1773).

Accordingly, Defendants resort to smoke and mirrors, arguing that
"Appellants are upset that Carmeuse and Helms might take all of the stone they
own." (Opp. Br. at 48). Thomas is fighting to prevent the utter destruction of the
Property (including the historic house). Reynolds and Wilson clearly did not intend
that Wilson would quarry on the entire surface of the Property. Not only did the
Yard Clause stand in the way, but several other clauses in the 1849 Deed did as
well. The district court itself recognized that the parties to the "Deed did not
envision the complete destruction of the entire tract's surface." (JA 1773). Plainly,

Reynolds *did* know that Wilson would not quarry all of the stone on the Property –

he and Wilson said as much in the 1849 Deed.[9]

### A. Reynolds and Wilson Did Not Contemplate the Complete Destruction of the Property.

Defendants argue that quarrying has not really changed because the most

simplistic definition of "quarrying" still applies. They contend that Reynolds and

Wilson contemplated the destruction of the entire surface because quarrying still

involves digging up the stone, breaking it into smaller pieces, and carrying it away.

(Opp. Br. at 47-54).

Defendants completely miss the mark. Reynolds and Wilson obviously

contemplated quarrying on the Property. Both understood that Wilson would

disturb the surface. That is not the issue. The issue is the *extent* of the disturbance

they intended. Plainly, Reynolds was concerned that Wilson's activities might

cause "annoyance," but he did not anticipate those operations would destroy his

house or be so massive as to create annoyance if conducted outside the Yard.

Virginia law does not give a mineral owner the right to destroy the entire

surface of a tract unless the right was clearly conveyed "in unmistakably plain

terms." *Leftwich,* 222 S.E.2d at 540 (citing *Stonegap Colliery Co. v. Hamilton,* 89

S.E. 305, 310 (Va. 1916)). No such terms exist here --- quite the opposite. The

1849 Deed demonstrates that the parties intended for Reynolds and his successors

---

[9] Indeed, Reynolds reserved the right to use some of the stone for himself! JA 245.

to remain on the Property and use the surface for continued farming and lime production. (JA 1773). The parties clearly did not intend for Wilson or his successors to take the entire surface of the Property.

Recall, the 1849 Deed conveyed both 200 acres of stone rights and an adjacent 127 acres in fee. Wilson's operations were unlimited on the 127-acre tract, but plainly restricted on the 200-acre tract where Reynolds retained the surface and granted only stone and associated easements. Certainly Wilson and Reynolds understood the difference between the two estates. Yet, under Defendants' construction, there is no difference between the two conveyances in the same deed. For them, a grant of limestone is a grant of everything. The 1849 Deed tells a different story.

*Beury v. Shelton,* 144 S.E. 629 (Va. 1928) does not help Defendants here. The Supreme Court did not hold "that limestone is a part of the surface . . ." (*See* Opp. Br. at 51). Rather, the Court held that an exception of "all metals and minerals" underlying the surface conveyed did not also except the limestone. The Court's reasons were two-fold: (1) the grantor would not have nullified the conveyance of the surface by reserving the right to destroy the entire surface by removing *all* the stone and minerals under the tracts conveyed; and (2) the grantor had reserved a right to use a limited part of the surface, indicating that he did not

intend to destroy the entire surface through mining and quarrying. 144 S.E.2d at 633.

Moreover, *Beury* was decided *79 years* after Reynolds and Wilson executed the stone severance in 1849. "Quarries" in 1849 consisted of small surface pits dug by hand, and operators removed the limestone manually --- aided by black powder.[10] (JA 500). Horse or mule-drawn wagons were used to move the quarried rock. (*Id.*). Dynamite did not even exist when Reynolds and Wilson signed the 1849 Deed. (JA 501).

The industrial revolution of the late 19th century then transformed America from an agricultural society to an industrial powerhouse. The destruction contemplated by the grantor's successors in *Beury* was nothing like the operations Reynolds and Wilson anticipated in 1849.

## B. Advancements Do Not Permit the Defendants to Enlarge the Estate Granted by the 1849 Deed.

Defendants did not purchase the surface of the Property. However, they now assert the right to destroy the whole using modern quarrying methods. (Opp. Br. at 47-48, 52-54). Controlling Virginia law prohibits this result.

---

[10] Thus, the old "quarries" found on and near the Property are located at "out crop zone[s]" (i.e., where the limestone formations stick out of the soil), because the "limestone could easily be targeted with minimal overburden removal." JA 500; 504.

23

The law permits improvements in technology, but it does not allow modern advancements to enlarge or diminish the estate granted or retained in a past deed. *Leftwich,* 222 S.E.2d at 541; *Ellis,* 142 S.E.2d at 538; *see also Clayborn v. Camilla Red Ash Coal Co.,* 105 S.E. 117, 122 (Va. 1920); *Hamilton,* 89 S.E. at 310; *Mullins v. Beatrice Pocahontas Co.,* 432 F.2d 314, 318 (4th Cir. 1970). This rule is based in simple logic: if a grantee wants more rights than those specified by the deed, he must pay for them. *Leftwich,* 222 S.E.2d at 540; *Clayborn,* 105 S.E.2d at 122; *see also Ratliff,* 24 S.E.2d at 563.

Defendants' reliance on *Oakwood Smokeless Coal Corp. v. Meadows,* 34 S.E.2d 392 (Va. 1945) is misplaced. The Supreme Court in *Leftwich* specifically acknowledged its prior decision in *Oakwood*, but then held that any advancement "which destroys what was reserved by the grantor, is not permissible." *Leftwich,* 222 S.E.2d at 541. Defendants' position, which would reduce the surface rights retained by Reynolds to nothing, is prohibited under Virginia law. *Id.*

## III.   THE CHANCERY DEEDS CONVEYED THE LIMESTONE.

### A. "Limestone" Does Not Mean "All Stone."

Unlike the district court, Defendants argue that the Chancery Deeds *unambiguously* convey all the stone rights under the Property. But, instead of relying on the language of the deeds and the referenced documents – as required by Virginia law – they seek to introduce extrinsic evidence to define "limestone" as

every pebble on the Property. (Opp. Br. at 39-41). Under any analysis, Defendants' argument establishes that the district court erred in construing the Chancery Deeds.[11]

This Court's decision in *James River Hydrate Supply Co. v. United States,* 337 F.2d 277 (4th Cir. 1964) cannot guide the Court's hand here. The issue in that case was whether certain dolomites of a requisite purity could be classified as "metallurgical grade" or "chemical grade" within the meaning of a tax depletion allowance statute. 337 F.2d at 278-79. After reviewing the history of the statutory provision, the Court held that Congress intended to include dolomites of a sufficient purity within the purview of the provision. *Id.* at 279-80. Significantly, the Court noted, *"[t]here is evidence that 'limestone' is sometimes used exclusively to indicate stones having very high calcium carbonate content as contrasted with dolomitic limestones . . ." Id.* at 279 (emphasis added).

The Court of Appeals for the Sixth Circuit reached the same conclusion in *Nat'l Lime & Stone Co. v. United States,* 384 F.2d 381, 382 (6th Cir. 1967). Again, the court there noted: "dolomite is generally regarded as a variety of 'limestone' . . . in a broad sense of the term, although *'limestone' in a narrower sense usually*

---

[11] Defendants' use of any extrinsic evidence is improper given their position that the Chancery Deeds are unambiguous. *See Amos,* 320 S.E.2d at 338. Regardless of any purported ambiguity, Defendants and the district court are both wrong.

*refers to stone with a higher percentage of calcium carbonate than that found in dolomite.*" *Id.* at 381 (emphasis added).

Neither court held that high-calcium limestone and dolomite are one and the same. They held that dolomite *can* be classified as limestone within the meaning of the tax code, and they recognize that the term "limestone" does not mean "all stone." These holdings support the undisputed facts here: dolomite and limestone are distinct, and were treated as such by the parties to the Chancery Deeds.

Even Defendants' expert concluded dolomite was "differentiated from limestone in the 18th century." (JA 1163).[12] He draws this distinction in his report. (*See* JA at 498; 507; 1163). Likewise, the undisputed evidence confirms that the chancery auction focused on the high calcium limestone, which is only found in the southwest portion of the Property. (JA 497; 507; 435-37; 1722).

"[T]he parties to the 1901 and 1902 Deeds were owners and operators of several limestone quarries." (Opp. Br. at 43). They plainly knew the difference between limestone, which was valuable, and dolomite, which had no commercial value. (*See* JA 1203-04 ("I've seen no evidence that dolomite was mined for any purpose . . . what's really obvious is the people were after the limestone . . .")).

---

[12] Defendants' attempt to sidestep this statement is unpersuasive. *See* JA 508 ("the phrase 'grey vein of limestone' referred to, at minimum, the Lincolnshire, New Market, and Edinburgh limestone formations on the property. The phrase *may* have also referred to the Beekmantown Dolomite formation as well.") (emphasis added).

26

The term "limestone" does not mean every rock on the Property. Defendants' argument is unfounded.

## B. Read Together, the Chancery Deeds Demonstrate a Clear Intent.

Like the district court, Defendants ignored well-established principles of deed construction by incorrectly treating the Chancery Deeds as analytically distinct. The proper analysis is to construe the 1902 Deed in light of its references to the 1901 Deed. *See James River Kanawha Co. v. Old Dominion Iron & Steel Corp.,* 122 S.E. 344, 349 (Va. 1924); *Oliver Refining Co. v. Portsmouth Cotton Oil Refining Corp.,* 64 S.E. 56, 59 (Va. 1909). Read together, the Chancery Deeds demonstrate a clear intent. (*See* Br. at 58-60).

### 1. The Chancery Deeds and the Chancery Documents Plainly Demonstrate that the "Grey Limestone" was Conveyed

Defendants ignore the plain language of the Chancery Deeds and the Chancery documents they reference.

The 1901 Deed conveyed the rights to "all the limestone . . . adjoining the above lands [309.75-acres of fee tracts], and along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from the line of the E. Dillon land . . ." (Parcel No. 2) (JA 1170-71; 1120). This language serves two purposes: (1) it describes the object of the conveyance – the limestone; and (2) it states the means by which the limestone is measured. The 1902 Deed then explicitly references the boundary established by

27

the 1901 Deed, and conveys the limestone not conveyed by the 1901 Deed (Parcel No. 1). (*See* JA 1121; 1247-48).

The "Additional Special Terms of Sale" document describing the two parcels simply confirms that together, the Chancery Deeds plainly convey: "*[Parcel 1:] the stone rights . . . along the vein of grey Limestone in a northeasterly direction . . . [Parcel 2:] and all the stone and mineral rights on the Pitzer land North-east of the line of division between this tract and tract no. 1 set out above under description of tract no. 1.*" (JA 429). The purpose of the Chancery documents and the 1901 Deed is clear: to convey the "vein of grey limestone."[13]

The chancery advertisement further establishes the intent of the Chancery Deeds by emphasizing the value of the grey limestone on the Property. Of course, the advertisement references "the right to quarry stone" on the Property, but then describes that "stone" as "gray limestone . . . of the purest quality, 98% pure carbonate of lime." (JA 436). Nothing in the advertisement indicates any intent to convey even dolomite, much less *all* the stone on the Property. The stone outside the grey vein had no commercial value.

---

[13] Defendants suggest that the 1901 Deed intended to convey all the stone on the Property because "all limestone is grey . . . on the Property." Opp. Br. at 43. This argument is directly contradicted by their expert, who described the dolomite formations as both "dark blue" and "dove-gray," but characterized the limestone formations as solely "grey." JA 498; 507.

## 2. The E. Dillon Line Locates the Limestone Conveyed

Defendants agree that the reference to the E. Dillon Line in the 1901 Deed served to locate the limestone conveyed. (Opp. Br. at 44). However, they argue that the reference solely serves to locate the 300-foot line, not to limit the conveyance. This contention is nonsensical, because these purposes are one and the same.

The E. Dillon line only borders the Property at the southwest corner.[14] The parties had no reason to pick such a specific and limited spot for measuring the dividing line if they had intended to divide and convey *all* the stone on the Property. Rather, they would have simply referenced the entire western boundary as the beginning point for the measurement. But, the Chancellor put the line in that specific place to (as Defendants assert) locate the conveyance. This location necessarily limits the conveyance the dimensions of the E. Dillon boundary line and to the grey limestone. Otherwise, the specific location of the measuring line serves no purpose. *See Halsey v. Fulton,* 89 S.E. 912, 913 (Va. 1916) ("[w]ords deliberately put into a deed, and put there for a purpose, are not to be lightly considered nor arbitrarily put aside").

---

[14] Defendants mislead in their claim that expert, Mr. McMurry, "confirmed that the Dillon had, at one point, owned both parcels on the Property's southwestern border. Opp. Br. at 44. He actually stated that he "did not do any research to confirm that Dillon owned the Hill property in 1901." JA 1503.

29

## C. The Court Must Effectuate the Plain Meaning of the Chancery Deeds.

Defendants cannot use deed construction here to void the references to the grey vein of limestone and the E. Dillon boundary. The Chancery Deeds are unambiguous: the 1901 Deed plainly conveys the limestone found in a rich vein located in the southwestern part of the Property. And 1902 Deed, which specifically references the 1901 Deed, picks up where the 1901 Deed left off. This Court must apply the language of the deeds as written, and give effect to the parties' intent. *Ratliff,* 24 S.E.2d at 562. The court below erred in failing to do so.

## CONCLUSION

The Court should reverse the district court's entry of summary judgment and enter judgment in Thomas's favor.


Dated: September 17, 2015                    Respectfully submitted,

                                             JUSTIN D. THOMAS
                                             IRENE S. THOMAS

                                             By: ___/s/ J. Scott Sexton___
                                                    Counsel

J. Scott Sexton (VSB No. 29284)
Scott A. Stephenson (VSB No. 88020)
GENTRY LOCKE
10 Franklin Street, S.E., Suite 900
Roanoke, Virginia 24022-0013
Telephone: (540) 983-9300
Facsimile: (540) 983-9400
sexton@gentrylocke.com
stephenson@gentrylocke.com

*Counsel for Appellants Justin D. Thomas and Irene S. Thomas*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)(2)(B)(i)
## AND LOCAL RULE 32(b)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) and Local Rule 32(b) because it contains 6998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, requests for oral argument, and any certificates of counsel).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point serifed typeface, Times New Roman, using Microsoft Word 2010.

/s/ J. Scott Sexton
Counsel

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, counsel of record for Appellants, does hereby certify on this 17th day of September, 2015, that the required copies of the foregoing Reply Brief of Appellants were filed with the Clerk of the court electrically using the Court's CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Thomas M. Lawson
Lawson & Silek, PLC
P.O. Box 2740
Winchester, VA  22604
tlawson@lspic.com
Counsel for Appellees

Robert C. Hagan, Jr.
Attorney at Law
P.O. Box 340
Daleville, VA  24083-0340
Counsel for Intervenor/Defendant-Appellee


/s/ J. Scott Sexton
J. Scott Sexton